CHANDLER, Justice,
for the Court:
¶ 1. A Madison County jury convicted Carla Hughes of two counts of capital murder. The jury declined to impose the death penalty, and the Circuit Court of Madison County imposed two sentences of life imprisonment without the possibility of parole, with both sentences to run concurrently. Hughes raises six issues on appeal:
I. Whether the jury committed misconduct by submitting a note to the judge during deliberations asking whether the State could have called Hughes to the stand.
II. Whether the verdicts are against the overwhelming weight of the evidence.
III. Whether the trial court erred during jury selection when it denied one of Hughes’s peremptory challenges.
IV. Whether the trial court erred by denying the motion to suppress the evidence found in Hughes’s house.
V. Whether the trial court erred in overruling Hughes’s motion for a directed verdict.
VI. Whether the trial court erred by admitting DNA evidence from a pair of TredSafe shoes.
¶ 2. Finding no error, we affirm the judgment of the Circuit Court of Madison County.

FACTS

¶ 3. Hughes was convicted of two counts of capital murder for the murder of Avis Banks and her unborn son. Hughes had been having an affair with Keyon Pittman, Banks’s fiancé. Pittman and Banks lived together in Ridgeland, Mississippi.
*619 ¶ 4. Pittman met Hughes in August 2006 at Chastain Middle School, where they both were teachers. They became friends and began a sexual relationship. Pittman testified that Banks had been unaware of his relationship with Hughes. According to Pittman, Hughes had remained in the relationship despite her knowledge that Pittman planned to marry Banks and that Banks was pregnant with his child. Pittman said Hughes had referred to him as her “future husband” when they were around Hughes’s friends and relatives. Pittman also testified that Hughes had been unhappy that Pittman would not leave Banks. Pittman testified that he repeatedly had told Hughes that he was not going to leave Banks to be with her, even when Hughes believed that she was pregnant.[1] He said that on one occasion, Hughes had started to drive to Pittman’s and Banks’s house to reveal her affair with Pittman, but Pittman had stopped her by threatening to call the police. Hughes had known where Pittman and Banks lived because she had been there on three prior occasions.
¶ 5. The Saturday after Thanksgiving 2006, Pittman and Banks were in Picayune, Mississippi, visiting Banks’s family. That day, Hughes and Pittman met at a hotel in Picayune. Because Pittman would not stay out late to be with Hughes, the evening ended on a bad note. On Sunday, Hughes told Pittman that “from this point on some things are going to change.” Pittman testified that, for the next few days, their relationship was more distant.
¶ 6. Four days later, on the afternoon of November 29, 2006, Pittman dropped off groceries at Hughes’s house to keep cool in her refrigerator while he coached basketball practice at Chastain Middle School. Pittman left Hughes’s house around 5:10 p.m. or 5:15 p.m.; practice began around 5:30 p.m. that evening and lasted until 7:30 p.m. or 7:45 p.m. Pittman spoke to Banks at 5:12 p.m. and at 5:36 p.m. that evening, when Banks was driving home from work. After practice, Pittman returned to Hughes’s house to pick up his groceries and noticed that Hughes was unusually quiet.
¶ 7. Pittman stayed at Hughes’s house for twenty to thirty minutes, leaving at about 8:30 p.m. While Pittman drove home, he called Banks, but she did not answer, and Pittman became concerned. When Pittman arrived home, he pulled into his normal parking spot and used the garage-door opener to enter the house through the garage.[2] He saw Banks lying in a pool of blood on the garage floor next to her car.[3] He ran into the garage and tried to rouse Banks, but she did not respond. Pittman quickly checked the house to see if anyone was there and then ran next door, where a neighbor called 911. When the police arrived at 8:46 p.m., Pittman was in the garage holding Banks’s body. The police ordered Pittman away from Banks and conducted a search of the residence. The paramedics arrived to treat Banks, but she was dead.
¶8. The police investigation concluded that Banks had arrived home between 5:50 p.m. and 6:00 p.m, and that she had been *620 killed shortly thereafter. The autopsy performed on Banks revealed that she was shot four times, stabbed three times, and slashed once. Three of the four gunshot wounds were fatal.[4] The stab wounds were not fatal, and may have occurred postmortem. All the bullets were from a .38 caliber weapon. The autopsy also confirmed that Banks had been in her second trimester of pregnancy, carrying a male fetus. Because the baby had died from maternal demise, his death was classified as a homicide.
¶ 9. The police collected several pieces of evidence during their investigation. The initial search of Pittman’s house revealed that the back door had been forced open. There were two shoe prints on the exterior side of the glass door where it appeared that the perpetrator had kicked the door. There were blood smears along the wall and light-switch plate. The door between the house and the garage was open, and there was a dent in the sheetrock where the doorknob had struck the wall. There was a bullet hole in the lower left corner of the garage door, but no shell casings were found. While it appeared that there had been a burglary, nothing was missing from the house. The police took a smear of the blood found on the light-switch plate, and took photographs of the shoe prints on the exterior glass door. They also lifted an impression of the shoe print from the glass door.
¶ 10. Pittman gave a statement at the police station. His clothes were photographed because they had blood on them. His hands were processed for gunshot residue, and each hand had a single particle on it. An expert witness testified that those particles could have come from touching Banks’s body. Pittman remained a suspect in the homicide until the investigation established that he had been at Chastain Middle School at the time of the murder. Pittman’s cell-phone records indicated that he had not been in the vicinity of his house during the time the murder occurred. Witnesses who had been at Chastain Middle School during basketball practice verified that Pittman had been at the school when the murder had occurred.
¶ 11. Employees at Chastain Middle School told police that Pittman had several girlfriends, including Hughes. Police initially talked to Hughes at Chastain Middle School on December 1, 2006. In this initial statement, Hughes said that she and Pittman were just friends. But Hughes gave another statement at the police station that evening in which she admitted that she had a sexual relationship with Pittman. Hughes also said that she did not own or have access to a gun. However, it was established Hughes had a gun on the day that the homicide occurred. Hughes’s cousin, Patrick Nash, testified that, on November 26, 2006, Hughes had asked him to borrow a weapon for protection because of attempted break-ins at her house. He said he had loaned Hughes a Rossi .38 caliber gun with five bullets inside it, and a three-and-a-half-to-four-inch-long folding hunting knife. Nash said that he showed Hughes how to use the gun. He gave Hughes no additional bullets.
¶ 12. After her interview with police, on the evening of December 1, 2006, Hughes returned the Rossi .38 caliber gun, and Nash noticed that no bullets were in it. Hughes did not return the knife. Nash became uneasy because Hughes had called him on the night of the murder and men *621 tioned that someone had killed Pittman’s girlfriend. Later, Hughes’s uncle, James Nash, asked Hughes if the gun had been involved in Banks’s murder. James testified that, in response, Hughes “kind of dropped her head and shrugged her shoulders, and I took that to be ‘I really don’t know1 or affirmative.”
¶ 13. Nash turned the Rossi .38 caliber gun over to the police on December 5, 2006. Hughes was arrested on December 6, 2006, on a charge of accessory after the fact. After Hughes’s arrest, Detective John Neal obtained a search warrant to search her house, which was executed on December 8, 2006. The police specifically were looking for six things:
1) Any firearm, ammunition, shell casing, bullet projectile or packaging for any firearm, ammunition, shell casing or bullet projectile.
2) Any tool or instrument with a folding blade which may be used to puncture, stab, slice or cut.
3) Any article of clothing which may contain evidence of blood or blood stains.
4) Any type of footwear which may contain the impression design as indicated in Exhibit “A.”
5) Any glove which may contain physical evidence of blood or blood stains.
6) Any notes, papers, documents or any form of written communication which may establish a relationship between Carla Hughes and Keyon Pittman.
A picture of the shoe-print impression taken from the crime scene was attached to the search warrant as Exhibit A. The police seized three items during the search: a pair of women’s size ten TredSafe[5] shoes, a photograph of Pittman that was in the master bedroom night stand, and a handwritten note/poem with the initials K.P. on it. The shoes had a tread pattern that appeared to match the shoe prints from the crime scene.
¶ 14. The shoes and the Rossi .38 caliber gun were sent to the Mississippi Crime Laboratory for testing. Testing showed that the tread pattern on the soles of the shoes matched the impressions lifted from the crime scene. Test projectiles from the Rossi .38 caliber gun were compared to the projectiles that were removed from Banks’s body and revealed that the gun had fired the bullets that had killed Banks.
¶ 15. Cell-phone records from Hughes’s cell phone were admitted into evidence. Mark Winstead, a radio-frequency engineer with Cellular South, testified about the cell-phone records. The records identified the cell towers from which Hughes’s calls had originated and terminated. Win-stead testified that each cell tower has a certain geographical range. He testified that a cell tower that became overloaded with calls would not transmit a call to a different tower, but would block the call. He prepared a map that was admitted into evidence showing the geographical range of cell towers in the relevant area. The Pittman/Banks home was within the geographical range of a certain cell tower located on Lake Harbor Drive in Ridge-land. That cell tower had a two-mile radius. The records showed that, at 5:37 p.m., Hughes had answered a call within the range of that cell tower. She had terminated the call within the range of that cell tower. The records further showed that, at 6:04 p.m, Hughes had placed a call within the range of that cell tower, and had terminated the call within the range of that cell tower. Hughes’s next cell-phone activity, at 6:07 p.m., was outside the range *622 of that cell tower. The prosecution argued that this evidence placed Hughes near the Banks/Pittman home at the time of the murders.
¶ 16. Thomas Gandy, a radio-frequency engineer for AT & T Mobility, testified about the cell-phone records of Pittman and Banks. The records showed Banks’s last call at 5:36 p.m. was in an area consistent her with traveling toward her home. Pittman’s calls from between 5:12 p.m. and 7:18 p.m. were all associated with the cell-tower coverage including Hughes’s house and Chastain Middle School, but not including his home. His calls from between 8:41 p.m. and 8:56 p.m. all were associated with the cell tower that covered his home.
¶ 17. Detective Neal testified that investigators determined from Hughes’s cellphone records that she had been within the vicinity of a cell tower near Pittman’s and Banks’s home between just after 5:30 p.m. and just after 6:00 p.m. In contrast, Pittman’s cell records showed that he had made calls in the vicinity of a cell tower near Chastain Middle School during that time frame. Because police had determined that Banks’s murder had occurred shortly after her arrival home, between 5:50 p.m. and 6:00 p.m., these cell-phone records implicated Hughes.
¶ 18. On December 8, 2006, the police upgraded the charges against Hughes to two counts of capital murder. Hughes was indicted on July 30, 2008, for two counts of capital murder under Mississippi Code Section 97-3-19(2)(e), for killing Avis Banks and her unborn child while committing a burglary with the intent to commit assault. Hughes’s trial began in October 2009.
¶ 19. Hughes did not testify. In defense, she attempted to implicate Pittman. Hughes showed that, at one time, Pittman had a key to her house. He had admitted that he had borrowed Hughes’s shoes occasionally. One defense witness testified that Pittman had not been inside the gym during the entirety of basketball practice as Pittman had stated; however, that witness was impeached with his earlier statement to the police that Pittman had been present during the entire practice. A friend of Hughes who lived inside the range of the cell-phone tower near the Pittman/Banks home testified that, to her knowledge, Hughes had not visited her house that night. No other evidence explained Hughes’s presence inside the range of the cell tower near the Pittman/Banks home at the time of the murders.
¶ 20. The jury found Hughes guilty of two counts of capital murder. The trial court imposed two sentences of life in the custody of the Mississippi Department of Corrections without the possibility of parole.

ANALYSIS

I. WHETHER THE JURY COMMITTED MISCONDUCT BY SUBMITTING A NOTE TO THE JUDGE DURING DELIBERATIONS ASKING WHETHER THE STATE COULD HAVE CALLED HUGHES TO THE STAND.
¶ 21. The trial judge instructed the jury that it was not to consider Hughes’s failure to testify as evidence of either guilt or innocence. During deliberations, the jury submitted a note to the trial court stating “Mould the State have called Carla Hughes to the stand?” Hughes’s attorney proposed that the court instruct the jury that the State had no power to call her to the stand. But, upon the agreement of the defense and the prosecution, the trial court instructed the jury to see Jury Instruction Number Four, which stated that:
*623 The Court instructs the jury that the fact that Carla Hughes, did not take the witness stand and testify cannot be considered by you for any purpose, and no inference whatsoever can be drawn against Carla Hughes, because of her decision not to take the stand and testify. The law gives every person charged with a crime the absolute and unqualified privilege of not testifying, if they so choose, and the law further requires that no inference adverse to that person can be drawn by you, the jury, because of her decision not to testify.
¶ 22. Hughes filed a motion for a judgment notwithstanding the verdict, or alternatively, a new trial. Hughes argued that the jury’s note showed that the jury erroneously had considered Hughes’s failure to testify. The trial court denied Hughes’s motion for a new trial on this ground because the trial court had instructed the jury in accordance with the parties’ agreed-upon response.
¶23. On appeal, Hughes argues that the note showed that the jury disregarded the court’s instructions not to consider Hughes’s failure to testify, constituting jury misconduct. She argues the note shows that the jury drew an adverse inference of guilt from Hughes’s exercise of her right to remain silent guaranteed by the Fifth Amendment to the United States Constitution. See U.S. Const., amend. V. Hughes argues that the jury misconduct gives rise to a presumption of prejudice, entitling her to a new trial. The State argues that the note did not show jury misconduct, because jurors are presumed to follow court instructions in the absence of evidence to the contrary. The State further argues that the note’s purpose may have been to assist the jury in determining whether the State had failed to support its case by not calling Hughes as a witness. The State also argues that there is no proof the jury actually considered Hughes’s failure to testify in determining guilt.
¶24. This issue is procedurally barred. As the State argues, when a party fails to make a contemporaneous objection, the appellate court is under no obligation to review the assignment of error. Caston v. State, 823 So.2d 473, 503 (Miss.2002). In this case, when the jury’s note was submitted to the court, Hughes did not object or move for a mistrial on the basis of jury misconduct. Instead, the defense and prosecution agreed that the court should instruct the jury to see Jury Instruction Number Four.
¶ 25. Hughes argues that she preserved the issue of jury misconduct for appeal by raising it in her motion for a judgment notwithstanding the verdict or a new trial. This Court has held that “if an appellant raises for review an issue not raised in the pleadings, transcript, or rulings, the appellant must have preserved the issue by raising it in a motion for new trial.” Page v. State, 64 So.3d 482, 489 (Miss.2011) (quoting Collins v. State, 594 So.2d 29, 36 (Miss.1992)). This gives the trial judge an opportunity to consider the alleged error before appeal. Id. Thus, a party must preserve the issue that the verdict was against the overwhelming weight of the evidence with a motion for a new trial. Carey v. State, 80 So.3d 131, 136 (Miss.Ct.App.2012). However, a party need not reassert an issue in a motion for a new trial when the facts surrounding the alleged error in the trial court’s ruling are fully apparent from the record. Harden v. State, 59 So.3d 594, 601 (Miss.2011). But “[rjaising objections in a motion for new trial which should have been made at trial has never been thought to cure the failure to object at the proper time.” Smith v. State, 797 So.2d 854, 856 (Miss.2001).
*624 ¶ 26. While a party may, in a motion for a new trial, preserve an issue for appeal that was not raised in the pleadings, transcript, or rulings, a motion for a new trial is not an opportunity to revive an issue which the party waived by failing to make a contemporaneous objection. Id. Here, the defense did not object or request a mistrial when the court received the jury’s note questioning the State’s ability to have called Hughes. Instead, the defense agreed to the trial court’s response to the jury’s note. Hughes raised the issue for the first time in her motion for a new trial. Accordingly, the trial court denied relief. This issue is procedurally barred due to the lack of a contemporaneous objection. Caston, 823 So.2d at 503. Notwithstanding the procedural bar, there was no error, because the jury is presumed to follow the instructions of the trial court. Grayson v. State, 879 So.2d 1008, 1020 (Miss.2004) (quoting Williams v. State, 684 So.2d 1179 (Miss.1996)). Jury Instruction Number Four was a correct statement of the law. Because the trial court properly referred the jury to Jury Instruction Number Four, and we presume that the jurors followed that instruction, the issue is without merit.
II. WHETHER THE VERDICTS WERE AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 27. Hughes argues that the verdicts were against the overwhelming weight of the evidence. Hughes argues that there was no direct evidence that she committed the murders. She complains that no eyewitness saw her shoot Banks, and there was no evidence that she and Banks knew each other, no evidence that she fired the murder weapon or wore the TredSafe shoes, and no evidence that she was in or around the Pittman/Banks home during the time of the murder. The State argues that the great weight of the circumstantial evidence supported the guilty verdicts.
¶ 28. Hughes challenged the weight of the evidence in her motion for a new trial. The trial court denied the motion. When reviewing a challenge to the weight of the evidence, this Court will not overturn a verdict unless it “is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Osborne v. State, 54 So.3d 841, 846 (Miss.2011) (quoting Bush v. State, 895 So.2d 836, 844 (Miss.2005)). “A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, ‘unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict.’ ” Bush, 895 So.2d at 844. “Rather, as the ‘thirteenth juror,’ the court simply disagrees with the jury’s resolution of the conflicting testimony.” Id. Reversal will occur only in exceptional cases where the evidence preponderates heavily against the verdict. Id. (quoting Amiker v. Drugs For Less, Inc., 796 So.2d 942, 947 (Miss.2000)).
¶ 29. We find that the verdict was not against the overwhelming weight of the evidence. The State established that Hughes had a motive for killing Banks. Hughes was upset that Pittman would not leave Banks to be with her, and once before had attempted to confront Banks. Hughes referred to Pittman as her future husband when they were around her family. Four days before the murders, Hughes and Pittman had an argument, and Hughes had said that “from this point on some things are going to change.”
¶ 30. Pittman testified that Hughes knew where Banks lived because she had been to the Pittman/Banks home on three prior occasions. Pittman also testified that Hughes knew what Banks looked like *625 because she had seen Banks once at the airport and once at the school. Cell-phone records placed Hughes in the vicinity of the Pittman/Banks home at the time of the murder. Pittman’s cell-phone records tended to confirm his presence at Chastain Middle School during the relevant time.
¶ 31. Nash verified that he had loaned Hughes a knife and a .38 caliber Rossi handgun loaded with five bullets on November 26, 2006, three days before the murder, and Hughes had returned the empty gun on December 1, 2006, after her police interview. Five bullets were found at the crime scene — four in Banks’s body, and one in the garage door. Ballistics testing confirmed that the gun Hughes had borrowed from Nash was the murder weapon.
¶ 32. Shoes with a sole matching the tread impression found on the glass door of the Banks/Pittman home were found in Hughes’s house. While Pittman admitted that he had worn Hughes’s shoes, the police verified that he had been wearing a pair of lace-up Cole Haan-brand shoes on the night of the murders. His closet was checked that night for shoes matching the footwear impression, and none were found. And DNA testing showed that Banks’s blood was on the shoes taken from Hughes’s closet.
¶ 33. The evidence did not preponderate so heavily against the verdicts that an unconscionable injustice would result from allowing the verdicts to stand. The verdicts were not against the overwhelming weight of the evidence.
III. WHETHER THE COURT ERRED BY DENYING ONE OF HUGHES’S PEREMPTORY CHALLENGES.
¶ 34. Hughes exercised one of her peremptory challenges on juror number thirty-two because that juror had expressed concerns about being away from work during jury service. The State made a Bat-son challenge, because Hughes had exercised five peremptory strikes on white men. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial court denied Hughes’s peremptory challenge, finding it was a pretext for discrimination, because Hughes had not exercised strikes on other jurors with similar concerns. On appeal, Hughes argues that the trial court’s finding of pretext was clearly erroneous, entitling her to a new trial.
¶ 35. A defendant has a right to be tried by a jury selected on the basis of nondiscriminatory criteria. Ryals v. State, 794 So.2d 161, 165 (Miss.2001). Batson established that the Equal Protection Clause of the United States Constitution prohibits racial discrimination through the use of peremptory challenges. Batson, 476 U.S. at 79, 106 S.Ct. at 1719. Under J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 129, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89 (1994), a party likewise may not base a peremptory challenge on gender. Batson, J.E.B., and their progeny established that the trial court must follow a three-step inquiry to determine whether there is a discriminatory reason for a peremptory challenge. Pitchford v. State, 45 So.3d 216, 224 (Miss.2010).
First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the [other party] to articulate a race-neutral reason for excluding that particular juror. Finally, after a race-neutral explanation has been offered ... the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the per *626 emptory strike, i.e., that the reason given was a pretext for discrimination.
Id. (citing Flowers v. State, 947 So.2d 910, 917 (Miss.2007)). A prima facie case can be shown “by demonstrating that the percentage of ... peremptory strikes exercised on members of the protected class was significantly higher than the percentage of members of the protected class in the venire.” Id. at 225 (citing Strickland v. State, 980 So.2d 908, 916 n. 1 (Miss.2008)).
¶ 36. In the second step of the inquiry, “the issue is the facial validity of the [party’s] explanation. Unless a discriminatory intent is inherent in the ... explanation, the reason offered will be deemed race neutral.” Lynch v. State, 877 So.2d 1254, 1271 (Miss.2004) (quoting Randall v. State, 716 So.2d 584, 588 (Miss.1998)). “[R]ace neutral explanations must be viewed in the light most favorable to the trial court’s findings.” Id. at 1270 (quoting Walker v. State, 815 So.2d 1209, 1215 (Miss.2002)). A juror’s reluctance to serve or preoccupation with matters outside the courtroom are valid race-neutral reasons for exercising a peremptory challenge. Id. at 1274 (citing Manning v. State, 735 So.2d 323, 340 (Miss.1999)). Also, a juror’s concern that jury service will interfere with his or her employment is a race-neutral reason for exercising a peremptory strike. Id. at 1275.
¶ 37. In the third step, the opposing party may attempt to refute the other party’s race/gender-neutral reason by showing that the reason was a pretext for discrimination. The Court has identified five “indicia of pretext” that may belie a race/gender-neutral reason for a strike:
(1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge;
(2) the failure to voir dire as to the characteristic cited; ... (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.
Id. at 1272 (quoting Manning v. State, 765 So.2d 516, 519 (Miss.2000)). In attempting to refute a race/gender-neutral reason, the opposing party may “point[ ] out that similar claims can be made about non-excluded jurors.’ ” McFarland v. State, 707 So.2d 166, 172 (Miss.1997) (citing U.S. v. Bentley-Smith, 2 F.3d 1368, 1373-74 (5th Cir.1993)). While disparate treatment is strong evidence of discriminatory intent, it is not necessarily dispositive of discriminatory treatment. Lynch, 877 So.2d at 1274 (citing Berry v. State, 802 So.2d 1033, 1039 (Miss.2001)); see also Chamberlin v. State, 55 So.3d 1046, 1050-51 (Miss.2011). “Where multiple reasons lead to a peremptory strike, the fact that other jurors may have some of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pre-textual.” Lynch, 877 So.2d at 1274 (quoting Berry, 802 So.2d at 1040).
¶ 38. This Court affords great deference to a trial-court ruling on a Batson challenge. Pitchford, 45 So.3d at 226 (quoting Lynch, 877 So.2d at 1270). “This is true because ‘the demeanor of the attorney making the challenge is often the best evidence on the issue of race neutrality.’ ” Lynch, 877 So.2d at 1271. We will not overturn the trial court’s ruling unless it was clearly erroneous or against the overwhelming weight of the evidence. Pitchford, 45 So.3d at 226 (quoting Lynch, 877 So.2d at 1270).
¶ 39. We find that the trial court did not err by denying Hughes’s peremptory challenge of juror number thirty-two. Hughes exercised five peremptory strikes against white males. The State raised a *627 Batson challenge, arguing that Hughes’s strikes were made on the basis of race and gender discrimination. The trial court required Hughes to state race and gender-neutral reasons for the strikes. Counsel for Hughes said that, after the trial court had allowed the State’s peremptory challenges,[6] few African-Americans were left. The trial court allowed three of Hughes’s strikes, finding that there were race/gender-neutral reasons for striking those jurors, but found that Hughes’s reasons for striking jurors number twenty-two and thirty-two were pretextual. The trial court found that Hughes’s reason for the strike of juror number twenty-two was a pretext for discrimination, because, although Hughes’s articulated race/gender-neutral reason was that the juror was unresponsive during voir dire, the juror had responded to some questions.[7]
¶ 40. Hughes’s articulated race/gender-neutral reason for striking juror number thirty-two was that the juror had expressed concern about being away from his job and unable to send job-related emails while sequestered. Under Lynch, juror number thirty-two’s concern for his employment was a race/gender-neutral reason for the strike. Lynch, 877 So.2d at 1275. But the State successfully showed that the reason was pretextual because Hughes had not exercised peremptory challenges on female jurors with similar concerns about the effect of sequestration on their responsibilities. For example, juror number four said she did not want to be sequestered because she was scheduled to speak at a conference and she was the only person who could give the presentation. Juror number nine stated that she would be heartbroken if jury service caused her to miss a reunion and a fundraiser. Juror number thirteen stated that sequestration would be a problem because she was supposed to take care of her grandchildren. Juror number twenty-three was concerned about missing her night classes. Of these four jurors, three were white females, and juror number thirteen was an African-American female.
¶ 41. Because Hughes had not exercised peremptory challenges on other jurors with similar concerns, the trial court found that Hughes’s articulated race/gender-neutral reason was a pretext for discrimination. While multiple reasons for the strike could have overcome Hughes’s disparate treatment of jurors number four, nine, thirteen, twenty-three, and thirty-two, Hughes struck juror number thirty-two for the single reason that he was concerned about the effect of sequestration on his job. See Lynch, 877 So.2d at 1274. Hughes did not challenge female jurors with similar concerns about the effect of sequestration on their responsibilities. The trial court also found that Hughes’s reason was pretextual because juror number thirty-two had said that being sequestered would not be a problem for him because he would be able to forward his work emails to another employee. Therefore, the trial court also found a lack of record support for Hughes’s contention that she struck juror number thirty-two because of his concern about his work responsibilities. Affording deference to the trial court’s determination, we hold that the trial court’s finding of pretext concerning Hughes’s strike of juror num *628 ber thirty-two was not clearly erroneous or against the overwhelming weight of the evidence.
IV. WHETHER THE COURT ERRED IN DENYING THE MOTION TO SUPPRESS EVIDENCE FOUND IN THE SEARCH OF HUGHES’S HOME.
¶ 42. Hughes moved to suppi’ess the evidence obtained in the search of her house on the ground that the séarch warrant was issued without probable cause. After a hearing, the trial court overruled the motion. Hughes argues that the search violated her constitutional right of protection from illegal search and seizure because there was no probable cause to issue the search warrant.
¶ 43. The Fourth Amendment to the United States Constitution and Article 3, Section 23 of the Mississippi Constitution protect an individual’s right of freedom from unreasonable searches and seizures. U.S. Const, amend. IV; Miss. Const, art. 3, § 23. When requesting a search warrant, the State must rely on facts that are sufficient to “warrant a [person] of reasonable caution in the belief that the action taken was appropriate.” Davis v. State, 660 So.2d 1228, 1238 (Miss.1995) (quoting Carney v. State, 525 So.2d 776, 783 (Miss.1988)). “[P]robable cause exists when the facts and circumstances within an officer’s knowledge are ‘sufficient to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it.’ ” Roach v. State, 7 So.3d 911, 917 (Miss.2009) (citing State v. Woods, 866 So.2d 422, 426 (Miss.2003)). This Court has held that the issuing court must consider the totality of the circumstances in making the determination of probable cause. Lee v. State, 435 So.2d 674, 676 (Miss.1983) (citing Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). “The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the ‘veracity’ and ‘basis of knowledge’ of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.” Id. (quoting Gates, 462 U.S. at 238-39, 103 S.Ct. at 2317). In determining whether the issuance of a search warrant was proper, this Court reviews whether there was a substantial basis for the conclusion that probable cause existed. Roach, 7 So.3d at 917 (quoting Gates, 462 U.S. 213, 238-39, 103 S.Ct. at 2317 (1983)).
¶ 44. During Hughes’s trial, the defense objected to the evidence obtained in the search warrant executed on Hughes’s house. The defense argued that the affidavit and “Underlying Facts and Circumstances” sheet submitted when Detective Neal applied for the warrant did not state sufficient facts to support a finding of probable cause that would permit the judge to issue the warrant. After a suppression hearing, the trial judge overruled the defense’s objection, finding that the affidavit, facts sheet, and oral testimony given before the municipal judge supported the finding of probable cause to search Hughes’s house. The defense made a continuing objection to all the evidence obtained from the search warrant, including the TredSafe shoes.
¶ 45. On appeal, Hughes argues that the trial court’s ruling was error because the municipal judge had lacked a substantial basis for the finding of probable cause. In particular, she points to the trial testimony of Detective Frank Dillard, who said that he had no evidence that Hughes actually had worn the TredSafe shoes on November 29, 2006. We review the evidence *629 that was before the municipal judge. When Detective John Neal applied for the search warrant, the municipal judge reviewed Detective Neal’s “Underlying Facts and Circumstances” sheet requesting the warrant and heard oral testimony from Detective Neal. The “Underlying Facts and Circumstances” sheet recited information about the crime scene and the police’s suspicion of Hughes after she voluntarily admitted to having a romantic relationship with Pittman. The sheet also included a crucial piece of evidence — Nash’s information that he had loaned a folding knife and a fully loaded five-shot Rossi .38 caliber gun to Hughes on November 26, 2006, and that Hughes had returned the empty gun on December 1, two days after the murder. Nash had turned that weapon over to the police. Detective Neal testified that he had explained orally to the municipal judge that the police had reason to believe that the gun Nash had submitted was involved in the murder because the autopsy had revealed that Banks’s wounds were caused by the same or similar caliber weapon.
¶ 46. We hold that the trial court did not err by finding that the municipal judge had a substantial basis for the finding of probable cause to issue the search warrant. The police had a weapon in custody that linked Hughes to the murders, and Hughes had a motive for killing Banks. Considering the totality of the circumstances, the facts and circumstances outlined in the “Underlying Facts and Circumstances” sheet, along with Detective Neal’s “Affidavit for Search Warrant” and oral testimony, a person of reasonable caution could conclude there was a probability that evidence of the crime was located at Hughes’s house. Therefore, the trial court did not err by overruling the motion to suppress and admitting the evidence obtained in the search of Hughes’s house.
V. WHETHER THE COURT ERRED IN OVERRULING HUGHES’S MOTION FOR A DIRECTED VERDICT.
¶ 47. Hughes argues that the trial court erred by denying her motion for a directed verdict on the capital-murder charges. Hughes argues that the State failed to prove the underlying crime of burglary, because the State did not prove that Hughes was at the Pittman/Banks home that evening. When reviewing a trial court’s ruling on the sufficiency of the evidence, “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’ ” Bush v. State, 895 So.2d 836, 843 (Miss.2005). “[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. at 843 (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). If the facts and inferences point in favor of the defendant with sufficient force that reasonable persons could not have found the defendant guilty beyond a reasonable doubt, then the reviewing court must reverse and render. Id. (quoting Edwards v. State, 469 So.2d 68, 70 (Miss.1985)). But if reasonable persons might reach different conclusions on every element of the offense, then the court will affirm. Id.
¶ 48. “A capital murder conviction under Miss.Code Ann. § 97-3-19(2)(e) must be supported by evidence legally sufficient to support a conviction of both the murder and the underlying felony, had either been charged alone.” Spicer v. *630 State, 921 So.2d 292, 311 (Miss.2006). Hughes was indicted under Mississippi Code Section 97-3-19(2)(e) for two counts of capital murder while “engaged in the commission . of the crime of burglary, in that she did willfully, unlawfully, felo-niously and burglariously break and enter into the dwelling house of [Banks], with the intent to commit the crime of assault therein....” See Miss.Code Ann. § 97-3-19(2)(e) (Rev.2006). The crime of burglary requires the breaking and entering of a dwelling house of another with the intent to commit some crime therein. Miss.Code. Ann. § 97-17-23(1) (Rev.2006).
¶ 49. Even though Hughes correctly argues that there was no direct evidence of burglary, direct evidence is unnecessary to support a conviction when the circumstantial evidence is sufficient to establish guilt beyond a reasonable doubt. Neal v. State, 805 So.2d 520, 526 (Miss.2002) (quoting Campbell v. State, 798 So.2d 524, 528-29 (Miss.2001)). Circumstantial evidence need not exclude every possible doubt, but should exclude every other reasonable hypothesis consistent with innocence. Id. As in cases involving direct evidence, in cases based on circumstantial evidence, it is the jury’s role to weigh the evidence and resolve any conflicts therein. Goff v. State, 14 So.3d 625, 650 (Miss.2009).
¶ 50. We find that there was sufficient evidence to permit a rational trier of fact to have found the essential elements of burglary beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. As discussed in Issue II, there was ample circumstantial evidence that Hughes broke and entered the Pittman/Banks home for the purpose of assaulting Banks. Hughes had a motive for harming Banks because Hughes was upset about Banks’s relationship with Pittman. Hughes knew where Banks lived because she had been to her house before. Cell-phone records placed Hughes in the vicinity of the Pittman/Banks home during the time of the murder. The murder weapon was linked to Hughes through Nash, who had loaned the loaded gun to Hughes a few days before the murders and had received the empty gun back from Hughes two days after the murders. The elements of breaking and entering were shown by police testimony describing how the rear door to the Pittman/Banks home had been forced open. And shoes matching the footwear impression made on the rear door of the Pittman/Banks home were found in Hughes’s closet, and Banks’s blood was found on the shoes.
¶ 51. Viewing the evidence in the light most favorable to the verdicts, the facts and inferences from the circumstantial evidence could lead a reasonable jury to find that Hughes was guilty of the two counts of capital murder beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. There was sufficient evidence to support the guilty verdicts, and the trial court did not err by denying Hughes’s motion for a directed verdict.
VI. WHETHER THE COURT ERRED BY ADMITTING DNA EVIDENCE FROM THE TRED-SAFE SHOES.
¶ 52. Hughes argues that the State did not show an unbroken chain of custody of the TredSafe shoes and that the trial court erred by admitting the results of the DNA testing of the TredSafe shoes performed by Dr. Bo Scales. This testing established that Banks’s blood was on the shoes. An argument that the State failed to establish the chain of custody is a challenge to the authenticity of the evidence. Deeds v. State, 27 So.3d 1135, 1142 (Miss.2009). Rule 901 of the Mississippi Rules *631 of Evidence states that “[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.” M.R.E. 901(a). “In order for the defendant to show a break in the chain of custody, there must be an ‘indication or reasonable inference of probable tampering with the evidence or substitution of the evidence.’” Deeds, 27 So.3d at 1142 (quoting Spann v. State, 771 So.2d 883, 894 (Miss.2000)). A mere suggestion that tampering possibly could have occurred does not satisfy the defendant’s burden. Id. This Court reviews a trial court’s admission or exclusion of evidence for abuse of discretion. Ellis v. State, 934 So.2d 1000, 1004 (Miss.2006).
¶ 53. The State argues that Hughes is procedurally barred from raising this issue because she did not contemporaneously object to the admission of the DNA evidence obtained from the TredSafe shoes. A contemporaneous objection is necessary to preserve an error for appellate review. Smith v. State, 797 So.2d 854, 856 (Miss.2001) (quoting Smith v. State, 530 So.2d 155, 161-62 (Miss.1988)). Hughes counters that she preserved the issue by raising it in her motion for a new trial. As previously discussed in Issue I, “[rjaising objections in a motion for new trial which should have been made at trial has never been thought to cure the failure to object at the proper time.” Id. We note that, at the trial, Hughes did object to the admission of the DNA evidence obtained from the shoes, and moved for a mistrial, but not until after the State had rested its case-in-ehief and the trial court had denied Hughes’s motion for a directed verdict. The trial court found that Hughes’s objection was untimely, and Hughes does not challenge this ruling on appeal. This issue is procedurally barred due to the lack of a contemporaneous objection.
¶ 54. Notwithstanding the procedural bar, this issue is without merit. No evidence supported an “indication or reasonable inference of probable tampering” that would have supported the exclusion of the TredSafe shoes. The State established the chain of custody for the relevant times as follows. The Mississippi Crime Laboratory’s test of the shoes was negative for the presence of blood. The chain-of-custody form shows that the Mississippi Crime Laboratory had custody of the shoes from December 13, 2006, through April 4, 2007, when an officer with the Ridgeland Police Department retrieved the shoes to store them in the evidence vault. On October 16, 2008, Assistant District Attorney Rebecca Mansell, Detective Brian Myers, and the evidence custodian opened the evidence bag, and Detective Myers visually inspected the shoes. When he noticed tiny spots that appeared to be blood on the side of a shoe sole, Mansell decided that the shoes needed to be tested for blood and DNA a second time. The shoes were released to Mansell. Detective Myers could not recall resealing the evidence bag, but he testified that it was policy for the evidence custodian to reseal the package and sign over the seal to prevent tampering.
¶ 55. On October 21, 2008, Greg Ek-lund, an investigator with the district attorney’s office, submitted the shoes to Scales Biological Laboratory for testing. The submission form stated “sealed evidence bag opened by Ridgeland P.D. Detective Brian Myers in presence of ADA Rebecca Mansell. Then transported to SBL by DA. Inv. Eklund.” A box was checked on the form indicating that the seals were intact. Dr. Scales’s testing revealed that Banks’s blood was present on the side of a shoe sole.
¶ 56. Hughes argues that two problems establish a break in the chain of custody. First, Hughes argues that, because the *632 first round of testing by the Mississippi Crime Laboratory was negative for the presence of blood, but the second round of testing by Dr. Seales was positive, there must have been tampering that deposited Banks’s blood on the shoes between testings. Second, Hughes argues that tampering is more likely because Dr. Scales testified that he received the shoes in a box without the wrapping, which arrived the next day.
¶ 57. The State provided an explanation for the second test of the shoes. During the first round of testing at the Mississippi Crime Laboratory, the upper sides and tops of the shoes were tested to prevent disturbing evidence on the soles of the shoes that would have inhibited the footwear impression testing. The spots of blood later identified on the shoes were on the side of the sole, which previously had not been tested. Dr. Scales testified that these spots were very difficult to see with the naked eye, but were “obvious” when viewed under a microscope. Dr. Scales testified that it would have been virtually impossible for Banks’s blood to have been transferred to the shoes at his lab because his lab did not possess a liquid sample of Banks’s blood, but only a stain of her dried blood on a card. He also testified that, typically, the lab would not accept an unsealed sample. While it appears irregular that Dr. Scales received the shoes in a box without wrapping, that fact alone is not enough to establish more than a mere suggestion that tampering or contamination of the shoes occurred. And under Deeds, a mere suggestion is not enough to establish a reasonable inference of probable tampering.

CONCLUSION

¶ 58. Hughes’s issues are without merit. The evidence was sufficient to support the verdicts, and the verdicts were not against the overwhelming weight of the evidence. The trial court did not err by denying one of Hughes’s peremptory challenges, and it did not err by denying Hughes’s motion to suppress the evidence obtained in the search of Hughes’s house. Hughes’s arguments based on jury misconduct and the trial court’s admission of DNA evidence from the TredSafe shoes are procedurally barred for lack of a contemporaneous objection. We affirm the judgment of the Circuit Court of Madison County.
¶ 59. COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE POSSIBILITY OF PAROLE, AFFIRMED. COUNT II: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE POSSIBILITY OF PAROLE, AFFIRMED. THE SENTENCES IMPOSED SHALL RUN CONCURRENTLY WITH EACH OTHER.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR, KITCHENS AND PIERCE, JJ., CONCUR. KING, J., NOT PARTICIPATING.

. Tests revealed that Hughes was not, in fact, pregnant.

. According to Pittman, it was customary for Banks to stop and pick up the mail when she arrived home from work, and then pull in the garage and close the garage door before getting out of her car.

.Banks’s purse, pieces of mail, and some keys were scattered next to Banks’s body, suggesting that she had just arrived home when she was killed.

. One shot went through Banks’s left buttock and abdomen, one went into her lower left chest wall and into her lung, and one was through the back of her head behind her left ear. Powder burns on Banks’s skin indicated that the shot through the head was made from close proximity.

. Several spellings of "TredSafe” appear in the record, including Tred-Safe and Tread Safe. This Court uses TredSafe, which is the correct spelling, according to the box in which the shoes were found at Hughes's house.

. The State used nine of its peremptory challenges, including five on African-Americans. The State was able to articulate race-neutral reasons for each of those strikes when the defense raised a Batson challenge, and the court allowed each strike.

. On appeal, Hughes does not challenge the trial court’s finding of pretext regarding juror number twenty-two.