CHANDLER, Justice,
for the Court:
¶ 1. After a trial in the Circuit Court of Tippah County, Regina Dees was convicted of arson and insurance fraud. For arson, the court sentenced Dees to ten years in the custody of the Mississippi Department of Corrections, with two years to serve and eight years suspended, with three years on post-release supervision. For insurance fraud, the court sentenced Dees to two years to run concurrently with the arson sentence. Dees appeals, challenging the sufficiency of the evidence supporting both convictions. Because the evidence sufficiently supports the convictions, we affirm.

FACTS

¶ 2. In January 2008, Dees made a claim against her Farm Bureau homeowner’s insurance policy arising out of the burglary of her residence in Ripley, Mississippi. In connection with this claim, Dees submitted a list to Farm Bureau of the stolen items *23 and was reimbursed $7,480.24 for her losses. On October 6, 2008, a fire at Dees’s residence destroyed the kitchen and caused extensive smoke and heat damage to the rest of the house. An investigation ensued, and Dees made another claim on her Farm Bureau policy. When Farm Bureau’s fire investigator visited the house, he noticed the presence of items which Dees had reported stolen in the burglary. Farm Bureau hired an electrical engineer who ruled out an electrical cause of the fire. Then, the State Fire Marshal’s office ruled that the cause of the fire was incendiary.

A. Arson conviction

1. Lay testimony

¶ 8. Stephen Freeman, a volunteer firefighter, testified that Ripley Fire and Rescue was notified of a fire at Dees’s residence at 4:36 a.m. on October 6, 2008. When firefighters arrived, the fire was growing and coming through the roof in the rear of the house. Freeman opined that the fire would have been at the fully involved stage when it was reported four minutes earlier. Nineteen volunteer firemen put out the fire at considerable risk to everyone involved. Freeman observed that Dees showed no signs of exposure to a major fire. He noticed that Dees, who was outside when they arrived, was wearing pajamas and had a lot of jewelry on; also, her carport and vehicle were packed with household items.
¶ 4. On October 7, 2008, Dees spoke to Farm Bureau’s claims adjuster, Delia Es-sary, about the fire, and two days later gave a voluntary statement to the fire marshal’s office. Dees said that she had been fixing up the house to sell. In the last few months, she had put down new floor tile, bought new kitchen appliances, and was painting. Dees said that her son had visited the day before the fire and they had celebrated his birthday. After he left, she applied oil-based primer to the wall behind the refrigerator and painted furniture. That night she fell asleep watching television in the living room. She was awakened when a wind chime fell from the ceiling and hit her on the head. She observed that “the room was unbearably hot[-]flames were all across the kitchen and ceiling and startling] to get smokey.” She ran out of the house, called 911, and tried to extinguish the fire with a garden hose.
¶ 5. Dees did not testify but told witnesses of her belief that the fire had been caused by an electrical problem. Dees said that lights had been flickering in the hall and that she thought that her new refrigerator might have started the fire. She told her expert witness on fire investigation that the light switch on the east kitchen wall had a problem. And she told Essary that she kept mineral spirits in the house because she had been painting.
¶ 6. The State presented the testimony of two deputy clerks with the Tippah County Circuit Clerk’s office. Crystal Graves testified that, a week before the fire, Dees visited the clerk’s office to see her ex-husband, the then-circuit clerk. Dees told Graves that she no longer liked her house and was in the process of moving. According to Graves, Dees said that the wires were not good, the appliances were old, and “[i]t will end up burning down before long.” When Graves asked why it was going to burn, Dees said that “the wires have never been good and it will catch a fire one of these days from it. The fridge has been making noise and it’s got problems too.” Graves was alarmed by the conversation and wrote it down. Rebekah Lewellen testified that, soon after the fire, Dees returned to the clerk’s office and said that the refrigerator had caused her house to burn down.
*24 ¶ 7. Dees’s son, Chris Dees, was a student at Northeast Community College in Booneville. Chris testified that, the day before the fire, he had visited Dees and she had asked him to take a number of items of sentimental value back with him to college. He testified that Dees’s house had been rearranged and photographs had been removed from the walls. The day after the fire, Dees told him that she thought the refrigerator had caused the fire.
¶ 8. Dees’s daughter, Alisha Basham, testified that her mother continually painted and remodeled the house. Basham testified that Dees had complained of a popping sound in the house.
¶ 9. The State presented evidence that Dees was undergoing financial hardship. She was unemployed, and her primary income was from disability benefits. She recently had taken out a second mortgage on her home. And three months before the fire, she had stopped receiving child support for Chris. In response, Dees put on evidence that, in October 2007, she had received her share of a settlement in the amount of $43,000.

2. Fire investigation testimony

¶ 10. Several fire investigators testified. Jonathan C. Owens, a deputy with the State Fire Marshal’s office, testified his initial investigation showed the cause of the fire was either electrical or incendiary. Owens determined that the point of origin of the fire was in the area of the kitchen table, which had been covered with clothes. There were seven breakers in the tripped position, including those to the kitchen and refrigerator. This indicated that an electrical problem in the kitchen had tripped the breakers. Owens testified that, because he is not an electrical engineer, he was unable to rule out an electrical cause. Because he was unable to determine the fire’s cause or rule out an electrical cause, Owens’s initial report stated that the fire’s cause was undetermined. But after he received the electrical evaluation of Farm Bureau’s electrical engineer, Dr. John K. Owens,[1] that ruled out an electrical cause, Owens issued an amended report that ruled the fire incendiary in nature.
¶ 11. Dr. Owens testified that he had inspected the electrical system and appliances and had determined that the fire was not ignited electrically. Dr. Owens explained that, while an electrical fire can occur when a short heats a wire’s insulation from the inside out, there was no evidence that a short occurred. He found that the circuit-breaker panel showed no signs of internal heating, and that the fire itself had caused the breakers to trip. Dr. Owens found that the refrigerator cord and wires in the attic displayed arching and beading, which, in some circumstances, can indicate internal heating caused by an electrical problem. But he determined that the arching and beading on the refrigerator cord and attic wires had been caused by fire damage, not from internal heating. He explained that oxidization on the wires would have shown they had overheated internally, and no oxidization was present. He opined that the fire had attacked the insulated wire and burned it, causing arching and beading that produced enough current to trip the breakers. He testified that no light switches had been involved in igniting the fire.
¶ 12. Dennis Welch, a fire investigator for Farm Bureau, visited the scene on October 8, 2008. He found significant fire patterns under the kitchen table and determined that was the point of origin. He testified that no patterns showed that the *25 fire had originated in the east wall of the kitchen. Welch testified that he smelled ignitable liquid in the kitchen. He collected samples of floor tile from the kitchen, including the table area, and sent them for testing. He also collected pieces of the kitchen light fixture, pieces of a cardboard box from the kitchen, and liquid from a melted bottle found in the kitchen in front of the washer and dryer. Dennis Akin, a fire debris analyst, tested these submissions for the presence of ignitable liquid. Akin determined that all the samples contained ignitable liquid. Some of the kitchen floor tiles contained a mineral-spirits-type distillate, probably paint thinner. Other floor tiles and the light fixture parts contained a heavy mineral-spirits-type product. Other floor tiles and the cardboard box pieces contained a deodorized-kerosene-type product, possibly lamp oil.
¶ 13. A.K. Rosenhan, the Fire Services Coordinator for Oktibbeha County, testified for Dees as an expert on fire origin and cause. Rosenhan testified that he is a mechanical engineer, not an electrical engineer. Approximately eleven months after the fire, he visited the scene and spoke with Dees. He saw nothing at the scene to indicate the cause of the fire was incendiary. Rosenhan testified that the mastic underlying floor tile can yield a false positive for the presence of flammable liquid. In response to Dr. Owens’s conclusion that the arching and beading on the wires showed that the fire had not been caused electrically, Rosenhan rejected this conclusion because the determination of whether arching and beading caused a fire or was caused by a fire is subjective.
¶ 14. Rosenhan testified that the fire pattern and fire damage were consistent with the fire having started in the east wall of the kitchen due to an electrical problem. He testified that the breaker that served the east wall was in the tripped position, which indicated an electrical problem in that area. But because electrical components had been removed since the fire, Rosenhan was unable to determine whether the electrical components in the east wall had caused it. Ro-senhan testified that Dees told him that there had been a problem with the light switch on the east kitchen wall, and that was consistent with what he found at the scene.

B. Insurance fraud conviction

¶ 15. On January 11, 2008, Chris returned home from college to discover that Dees’s home had been burglarized. The police discovered that the point of entry was the carport door window, which had been broken. Dees submitted a contents list of everything that was stolen to Farm Bureau. Stan Sims, who investigated the claim, testified that it was unusual that Dees had receipts for most of the stolen items. Nonetheless, Farm Bureau paid Dees $7,480.24 for her theft-loss claim and closed the file.
¶ 16. Welch testified that, when he investigated the fire scene, he noticed some items in the house that had been part of the theft-loss claim. These items later were matched to those on the contents list. They included a television, a stereo tuner, two keyboards, a CD player/radio, a DVD player, and a truck lift kit. Farm Bureau reopened the theft investigation. During the investigation, Sims discovered that Chris had several items in his college residence that matched those on the contents list, including a Game Boy, a Gameboy case, a Super Nintendo gaming system, compact discs, a DVD player, a Playstation 2 gaming system, video games, DVDs, a range router, a MP3 player, a laptop computer, a flash drive, a printer, and a wireless mouse. The police told Sims that they had not recovered any of the stolen items.
*26 ¶ 17. Chris testified that, on several occasions after the burglary, Dees came home with black garbage bags full of items she had reported as stolen. On these occasions, Dees said they had been recovered by the police or that she had found them in a pawn shop. Chris found this explanation suspicious. He became especially suspicious when Dees returned his Playstation, saying she found it at a pawn shop. The power cord was missing, and he told her the machine was useless without it. He asked Dees what pawn shop the Playstation had come from so that he could see if they had the power cord. But Dees immediately went outside and returned with the power cord.

LAW AND ANALYSIS

I. THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE ARSON CONVICTION.
¶ 18. Dees preserved her challenge to the sufficiency of the evidence with her request for a peremptory instruction on both charges, which was refused by the trial court.[2] Shumpert v. State, 935 So.2d 962, 966 (Miss.2006). On review of the sufficiency of the evidence, “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’ ” Bush v. State, 895 So.2d 836, 843 (Miss.2005) (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). “[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Bush, 895 So.2d at 843 (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Considering the evidence in the light most favorable to the verdict, we will affirm if, “having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense.” Bush, 895 So.2d at 843 (quoting Edwards v. State, 469 So.2d 68, 70 (Miss.1985)). But if “the facts and inferences ... ‘point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty,’ ” then we must reverse and render. Id.
¶ 19. The case against Dees was circumstantial. Nonetheless, “direct evidence is unnecessary to support a conviction when the circumstantial evidence is sufficient to establish guilt beyond a reasonable doubt.” Hughes v. State, 90 So.3d 613, 630 (Miss.2012). “Circumstantial evidence need not exclude every possible doubt, but should exclude every other reasonable hypothesis consistent with innocence.” Id. In both direct and circumstantial cases, the jury is empowered to weigh, and resolve conflicts in, the evidence. Id.
¶ 20. Mississippi Code Section 97-17-1(1) provides that “[a]ny person who willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels or procures the burning of any dwelling house, whether occupied, unoccupied or vacant ... shall be guilty of arson in the first degree.... ” Miss.Code Ann. § 97-17-1(1) (Rev.2006). Dees contends the evidence was insufficient to show that she willfully and maliciously set the fire. Specifically, she contends that, because the kitchen had known electrical problems, *27 wires in the kitchen showed arching and beading, the kitchen’s breakers were tripped, and the paint thinner was explained by her painting activities, there was a reasonable hypothesis consistent with innocence that the fire was electrical.
¶ 21. We disagree with Dees’s analysis of the evidence and find that the circumstantial evidence presented by the State was sufficient to sustain her conviction of arson. Testing of the floor tile and other items taken from the area of origin revealed the presence of flammable liquids. Owens testified that there were two possible causes of the fire, electrical or incendiary. While Owens lacked the expertise to rule out an electrical cause, Dr. Owens, an electrical engineer, examined the electrical wiring and appliances, and concluded that the fire was not caused electrically. Dr. Owens found that the circuit-breaker panel showed no evidence of internal heating. Dr. Owens testified that the arching and beading on the involved wires had occurred as a result of the fire, not from internal heating from an electrical problem. Although Dees’s expert, Rosenhan, contended that this finding was subjective and that the fire was caused electrically, Rosenhan lacked electrical-engineering expertise. Further, Rosenhan’s testimony that fire patterns showed the fire started on the east wall was contradicted by the testimony of Owens and Welch. Rosenhan admitted that he was unable to verify that electrical components on the east wall had caused the fire, because those components had been removed at the time of his inspection. And Rosenhan’s conclusion that the fire had an electrical cause relied in part on Dees’s unverified description of a problem with a light switch on the east wall. Given the fact that Dr. Owens possessed expertise that Rosenhan lacked, reasonable jurors could have rejected Ro-senhan’s testimony in favor of the testimony of Dr. Owens, Owens, and Welch, and found beyond a reasonable doubt that the fire did not have an electrical cause and was incendiáry.
¶ 22. Further evidence supported a conclusion beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that Dees had set the fire. The day before the fire, Dees removed items of sentimental value and gave them to Chris. And when firefighters arrived, Dees had a lot of jewelry on and her vehicle and carport were filled with items. From these facts, a rational jury could have inferred that Dees had tried to preserve her belongings before she set the fire. And a rational jury could have concluded from Dees’s financial situation and the strong evidence supporting her prior commission of insurance fraud that Dees had the motive to burn down her house and recover the insurance proceeds.
¶ 28. A rational jury could have concluded that Dees’s statements before and after the fire that the lights had been flickering and that problems existed with a light switch and the refrigerator were self-serving attempts to establish an electrical cause for the fire. Bolstering this conclusion is the fact that, one week before the fire, Dees predicted that her home was going to burn due to an electrical problem. Considering the evidence and all favorable inferences in the light most favorable to the verdict, a reasonable jury could have found beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence that Dees willfully and maliciously set fire to her house.
II. THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE INSURANCE-FRAUD CONVICTION.
¶ 24. Dees was convicted of insurance fraud under Mississippi Code Section 7-5-303(2)(a), which provides that “[a] person *28 or entity shall not, with the intent to appropriate to himself or to another any benefit, knowingly execute, collude or conspire to execute or attempt to execute a scheme or artifice ... [t]o defraud any insurance plan in connection with the delivery of, or payment for, insurance benefits, items, services or claims.... ” Miss. Code Ann. § 7-5-303(2)(a) (Rev.2002). Dees challenges the sufficiency of the evidence on the basis that her Farm Bureau homeowner’s insurance plan did not meet the statutory definition of “insurance plan.” Mississippi Code Section 7-5-303(l)(a) provides the definition of insurance plan and states:
“An insurance plan” means a plan or program that provides health benefits whether directly through insurance or otherwise and includes a policy of life or property and casualty insurance, a contract of a service benefit organization, workers’ compensation insurance or any program or plan implemented in accordance with state law or a membership agreement with a health maintenance organization or other prepaid program.
Miss.Code Ann. § 7-5-303(l)(a) (Rev. 2002).
¶ 25. Dees argues that, under Section 7 — 5—303(l)(a), the defrauded insurance plan must be one that provides health benefits. The State argues that Section 7-5 — 303(l)(a) contains no such limitation, because it refers to life or property and casualty insurance. It is true that Section 7-5-303(l)(a) refers to life and property and casualty insurance. It provides that a plan or program that provides health benefits and includes a policy of life or property and casualty insurance is “an insurance plan” under the statute. Miss.Code Ann. 7 — 5—303(l)(a). In an unpublished opinion, the United States District Court for the Southern District of Mississippi found that only insurance plans which provide health benefits are included in the definition of “insurance plan.” Brown v. State Farm Fire & Cas. Co., 2007 WL 1657417 at *6 (S.D.Miss.2007). The district court stated:
Life, property and casualty policies are mentioned in the definition of “insurance plan,” but these are included within the statutory definition only insofar as they provide health benefits. If the legislature had intended for this statute to encompass all forms of insurance, it would have expressed that intent by defining an “insurance plan” as any plan or policy of insurance without the qualifying and limiting verbiage. Plaintiffs’ effort to bring their homeowners’ policy within the statutory definition of “insurance plan” fails because a homeowners’ policy provides no health benefits. For this reason alone, the court rejects plaintiffs’ argument that they belong to the class this statute was designed to protect.

Id.

¶ 26. This case does not require this Court to decide whether policies of insurance that do not offer health benefits are included within the definition of “insurance plan” under Section 7-5-303(l)(a). This is because the evidence before the jury showed that Dees’s homeowner’s policy provided for $1,000 in medical benefits. Because the defrauded insurance plan in this case included health benefits, it came within the definition of “insurance plan” under Section 7-5-303(l)(a). And Dees did not have to defraud her insurance plan of medical benefits in order to violate Section 7-5-303(2)(a). That statute is violated by defrauding “any insurance plan in connection with the delivery of, or payment for, insurance benefits, items, services or claims,” and is not limited to defrauding an insurance plan of medical benefits. The evidence that Dees defrauded an insurance plan was sufficient to sustain her conviction of insurance fraud under Section 7-5-303(2)(a).
*29 ¶ 27. We note that Dees, for the first time in her reply brief, argues that the definition of “insurance plan” in Section 7-5-303(l)(a) is unconstitutionally vague. The State has filed a motion to strike the argument because it was raised for the first time in the reply brief, depriving the State of an opportunity to respond. This Court has held that it does not consider new issues raised for the first time in an appellant’s reply brief. Bishop v. State, 882 So.2d 135, 155 (Miss.2004). Therefore, we grant the State’s motion to strike.

CONCLUSION

¶28. Because the evidence was sufficient to sustain Dees’s convictions of arson and insurance fraud, we affirm.
¶ 29. COUNT I: CONVICTION OF FIRST DEGREE ARSON AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH EIGHT (8) YEARS SUSPENDED, AND THREE (3) YEARS ON POST-RELEASE SUPERVISION, AFFIRMED. COUNT II: CONVICTION OF INSURANCE FRAUD AND SENTENCE OF TWO (2) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THE SENTENCE IMPOSED IN COUNT II SHALL RUN CONCURRENTLY WITH THE SENTENCE IMPOSED IN COUNT I. APPELLANT SHALL PAY COURT COSTS, RESTITUTION AND BOND FEE TOTALING $7,706.24, WITH CONDITIONS.
WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, PIERCE, KING AND COLEMAN, JJ., CONCUR.

. Dr. John K. Owens and Jonathan C. Owens are not related.

. Dees did not file a motion for judgment notwithstanding the verdict.