# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00173-COA

CARLOS RONCALI A/K/A CARLOS JAMES RONCALI        APPELLANT

v.

STATE OF MISSISSIPPI        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/20/2023 |
| TRIAL JUDGE: | HON. MARK SHELDON DUNCAN |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ZAKIA BUTLER CHAMBERLAIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 02/20/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**EMFINGER, J., FOR THE COURT:**

¶1. In the Circuit Court of Newton County, Mississippi, Carlos Roncali (Roncali) was convicted of capital murder for the death of his wife, Marian Chaney Roncali (Marian). He was sentenced to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections without the eligibility of parole. Roncali appeals his conviction and sentence. As discussed below, after our review of the issues presented, we reverse and remand this case to the circuit court for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶2. On the morning of Sunday, September 6, 2020, Investigator Freddie Gentry of the

Newton County Sheriff's Office responded to a dispatch call regarding a female victim, Marian, who had been found deceased in her home in Newton County. Marian and Roncali lived in the home with their son, Elijah (Eli), and Roncali's parents, James and Sherry Roncali. Investigator Gentry learned that foul play—possibly murder—was suspected.

¶3.     When Investigator Gentry arrived at the Roncali residence, first responders and other officers were already on the scene. Eli, James, and Sherry Roncali were also at the house. As Investigator Gentry approached the residence, he observed Roncali standing outside the front door. Investigator Gentry explained that he knew both Marian and Roncali from growing up in the same area. Investigator Gentry testified that he greeted Roncali, but Roncali did not respond and seemed "kind of like he was out of it."

¶4.     When Investigator Gentry entered the house, he saw Marian's body lying just inside the front door. Investigator Gentry testified that Marian appeared to have bruises on her face, arms, and legs. Upon seeing her body, Investigator Gentry walked back outside and asked a deputy to detain Roncali as a person of interest. Investigator Gentry then went back inside the house and photographed Marian's body as well as other evidence inside the house. These photographs were admitted into evidence at trial.

¶5.     Investigator Gentry testified that when he entered Marian and Roncali's bedroom, he observed evidence indicating that a fight or disturbance had occurred. He also saw blood on the floor, three cut zip ties, and a cell phone charger cord tied in a knot. Investigator Gentry further testified that upon closer inspection of Marian's body, he noticed ligature marks on her wrists and ankles that were consistent with the zip ties he found in her bedroom. He also

2

testified that Marian had bruising around both of her eyes and down the side of her face, nose, and lips.

¶6.     Because of Marian's prior service as a police dispatcher, Investigator Gentry called the Mississippi Bureau of Investigation (MBI) to assist in the investigation. Three MBI officers, including Lieutenant Brad Edmondson, arrived at the scene and took the lead on the investigation.

¶7.     Lieutenant Edmondson testified that upon observing Marian's body, he noted that her clothing was disturbed and that her shirt was rolled up her back. He also saw numerous bruises along her arms, legs, and face, with injuries to her nose, lip, cheek, and forehead. Lieutenant Edmondson testified that the zip ties found inside Roncali and Marian's bedroom seemed to have made the marks on Marian's wrists and ankles. Based on his observations and the information he received from Investigator Gentry, Lieutenant Edmondson believed that the case involved "a homicide and/or a kidnapping."

¶8.     Lieutenant Edmondson testified that by the time he arrived at the scene, Roncali had been taken into custody. Because officers believed Roncali "may be impaired," they detained him for at least twenty-four hours to allow him to "sober up" prior to talking with investigators.

¶9.     Lieutenant Edmondson and MBI agent Rodney Williams met with Roncali at the Newton County Sheriff's Office. After waiving his *Miranda*[1] rights, Roncali submitted to a nearly two-hour interview with the MBI officers. Roncali was indicted in September 2021

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

for the capital murder of Marian, with the underlying felony of kidnapping.

¶10. Roncali's trial was held in December 2022. At trial, the jury heard testimony from Investigator Gentry; Lieutenant Edmondson; Eli; John Thompson, the Roncalis' neighbor; Dr. Mark LeVaughn, a forensic pathologist; and Dr. Chris Long, a toxicologist. The trial court admitted the recording of Roncali's interview with the MBI officers into evidence, and the entire recording was played for the jury.

¶11. During the interview, Roncali initially denied having any issues or fights with Marian in the days leading up to her death. Roncali stated that he woke up early on Friday or Saturday morning[2] and went outside. When he returned to the house, he noticed that his and Marian's bedroom was destroyed. Roncali claimed that Marian was "hollering" and throwing items around the room, and he could not calm her down.

¶12. When the officers asked Roncali why Marian was hollering, Roncali launched into a lengthy discussion about their twenty-year marriage. Roncali described Marian as his "right hand man" and stated that they took care of each other. Unprompted, Roncali mentioned that he had previously served a five-year jail sentence for having a cell phone in jail. Roncali stated that upon his release, he discovered that Marian had been unfaithful to him while he was incarcerated. Roncali claimed that Marian had cheated on him with at least twenty people, one of whom was JoJo Logan, the son of Marian's employer. Roncali said that they tried to move past it, but just before Marian died, he suspected that she had cheated again, and he questioned her about it. Marian admitted to Roncali that she had been

_____

[2] Roncali told investigators that the events occurred on Saturday and then later corrected himself and said they occurred on Friday.

4

unfaithful. Roncali told the investigators that he "lost his shit" when he found out she was cheating.

¶13. The officers asked Roncali about a prior incident of domestic abuse that resulted in an injury to Marian's spleen. Roncali initially stated that Marian told him she fell at a store. Upon further questioning, Roncali eventually told the officers that "many years ago," he had a bad headache, and Marian came over and shook him. In response, Roncali hit Marian, which resulted in an injury to her spleen. Roncali clarified that the incident occurred twenty years ago.

¶14. During his interview, Roncali repeatedly told the officers that he would not kill his wife, and he denied hitting or hurting Marian. However, Roncali eventually admitted that he and Marian had used methamphetamine on the weekend she died. Roncali explained that he became hooked on methamphetamine decades ago, but he hid it from Marian for a long time. Eventually, he and Marian started using methamphetamine together. On the weekend of Marian's death, Roncali explained that he "fixed [Marian's] needle" for her because that was their typical routine when ingesting methamphetamine. Roncali stated that he and Marian took the same "hit" of methamphetamine.

¶15. Roncali described Marian's initial behavior after ingesting methamphetamine on the Friday before her death as "crazy." Roncali admitted to tying Marian up, but he repeatedly claimed that he only did it so she would quit hurting herself. Roncali initially denied hitting Marian while she was tied up, but he eventually admitted to hitting her in an attempt to get her to settle down. Roncali also stated that he "smacked" her when she called out the names

5

of men with whom she had been unfaithful. Roncali stated that when Marian continued to call out the names, he gagged her with a bandana.

¶16. Roncali described Marian's condition later that weekend as "out of it." Roncali stated that he put cold water on Marian on Saturday to "see if she'd come back right." On Sunday, he put her in the bathtub to see if that would help improve her condition. Roncali said that after he bathed Marian, he and his son, Eli, took her into the living room where Roncali lay on the couch, and Marian lay on the floor. Roncali admitted that he and Eli had to help Marian move around. Roncali told officers that Marian had reacted to methamphetamine in a similar way one other time, but he stated that Marian might have had a reaction to her medication.

¶17. Roncali admitted that during the entire weekend, he never called 911. Roncali claimed that he told Eli to call 911, but Roncali later admitted he had not wanted anyone to call 911 because of the "pills and stuff" he had inside the house. Roncali told the officers that he tried to call his niece who worked as an EMT, but she did not answer his call. Roncali stated that Eli eventually called 911 on Sunday while Roncali was asleep. Roncali claimed Marian had been awake and talking just before he fell asleep. Roncali told officers that the "only thing [he] did wrong [that weekend] was tie her up."

¶18. Eli was nineteen years old at the time of Marian's death.[3] Eli testified that for the two years preceding his mother's death, he, his brother, and his parents lived with Roncali's

---

[3] Due to his age, Investigator Gentry arranged for Eli to be interviewed by a juvenile forensic interviewer. Investigator Gentry and Lieutenant Edmondson attended the interview. This interview was not offered into evidence.

6

parents in Newton County. Eli testified that he was at home on the weekend Marian died. Eli stated that on Friday evening, both Marian and Roncali seemed "a little off," describing them as "hyper" and "excited" but still able to hold a conversation. Eli testified that he had seen his parents behave in this manner on prior occasions.

¶19. Eli fell asleep at around 9 or 10 p.m. on Friday, and the next morning, his grandmother (Sherry) woke him up and told him that something was wrong with Marian. When Eli woke up, he heard his mother yelling and talking loudly. Eli went into his parents' bedroom to see what was happening. When he walked in, he observed that their room was in disarray, explaining that he saw clothes, broken lamps, and glass on the floor. Eli testified that Marian was on the floor, naked, and Roncali was on top of her, holding her down. According to Eli, Marian was making noises and trying to talk, but she was not making sense. Eli testified that Marian kept saying, "You want to know something?" and then she listed off the names: "Carlos, Ms. Mary, JoJo." Eli described Marian as "in a trance," but Roncali was in the same "excited" state he had been in on Friday night. Eli testified that his mother could not recognize him, and she remained in the same incoherent state throughout the day on Saturday.

¶20. Eli noticed that Marian had bruises "all over her [body]—head, arms, legs, chest, stuff like that. All over." Eli testified that Roncali also had scratches on his face, arms, and legs. Roncali told Eli that Marian got the bruises from "hitting the floor." Eli testified that while he was in his parents' room, Marian kept throwing her legs up in the air and dropping them down on her heels.

¶21.    Eli testified that when he saw his mother's condition, he asked Roncali if he could call 911. Roncali responded, "I don't know," and just stood there looking at Marian as if he were trying to assess what was happening. Eli later clarified that Roncali "didn't want to call" 911. Eli testified that he and Roncali stayed with his mother for a while, and then Roncali left. Eli stated that Sherry also approached Roncali and asked him what to do, not understanding what was going on.

¶22.    Roncali eventually returned to the bedroom with zip ties. Roncali told Eli that he did not want Marian to hurt herself, so he planned to tie her arms together. Eli testified that he tried to comfort Marian by holding her head while Roncali bound her arms and legs. Roncali ultimately hog-tied Marian, and Eli testified that Marian remained tied up for approximately two hours. Eli testified that during this time, Marian was naked but covered with a blanket.

¶23.    Eli told the jury that Marian never asked to be untied. Eli observed that Marian was dirty from being on the floor, so he eventually asked Roncali if he could untie her so that Marian could shower. Eli testified he was also concerned that the zip ties were too tight because they caused "markings" to form on Marian's body. Eli testified that Roncali agreed to undo the zip ties, and Roncali cut them off with scissors. Roncali and Eli then took Marian outside and used a hose to wash her. Roncali then took Marian to the shed behind the house, and Eli brought out clothes for her to put on. Roncali and Eli then helped Marian back into the house, and they sat her on a chair in the living room. Eli stated that Marian could not walk by herself, so he and Roncali helped her move around the house.

¶24.    Eli testified that he thought Marian was the most comfortable in the living room, so

she remained there for most of Saturday afternoon. Eli testified that the Roncalis' neighbor John came over to the house on Saturday afternoon for a few hours. Eli observed that over the course of the day, Marian's bruises became more pronounced. Eli testified that he tried to give his mother something to drink throughout the day, but she would not drink anything. Eli fell asleep around 11 p.m. on Saturday night, and he testified that he did not hear any disturbances during the night.

¶25. On Sunday morning, Eli woke up around 6 or 7 a.m. and found Marian in her room again. Eli testified that Roncali had straightened up the bedroom on Saturday night, but when Eli went into the room on Sunday morning, the room was in a state of disarray again. Eli testified that his mother was still moaning, and she was lying on the floor again like she had been the previous morning. Marian had clothes on, but they were disheveled. Eli testified that in addition to the bruises on Marian's arms, legs, and face, he also observed a little bit of blood on her. Eli testified that Marian still did not appear to recognize him.

¶26. Eli asked Roncali again about calling 911, but Roncali told Eli that he wanted to "get the room right." Eli then asked his grandparents about calling 911, and they responded that Roncali might go back to jail if they called.

¶27. Eli suggested that they give Marian another shower. Roncali agreed, so he and Eli helped Marian into the bathroom, where Roncali cleaned and washed her. Eli testified that Roncali kept Marian's clothes on her while he gave her a shower. After this second shower, Roncali carried Marian into the living room and laid her on the floor. Roncali lay on the couch and fell asleep. Eli testified that at this point, Marian was still unable to walk on her

9

own. Eli went to his room for about fifteen to twenty minutes. When he could not hear any noise in the living room, he went to check on his mother. Eli realized Marian was not moving or breathing. Eli testified that he tried to wake Roncali, and when Roncali would not wake up, Eli ran to their neighbor John Thompson's house and called 911.

¶28. Eli also testified about his parents' relationship, describing it as "good at times, bad at others." Eli stated that he had witnessed Roncali physically abuse Marian a few times in the past and that Marian would get bruises from the abuse. Eli testified that the most recent incident of physical abuse occurred a few months prior to Marian's death. As for the bruises on Marian's body from the weekend of her death, Eli testified that it did not appear that Marian had caused the bruises herself.

¶29. John testified that he had been at the Roncalis' home on Saturday afternoon for a couple of hours. John testified that when he saw Marian that day, Marian was "acting weird . . . like she was high on something." John described Marian's behavior as "obnoxious" and "erratic." John testified that other than her being high, he did not observe any signs that Marian was in medical distress. However, John later testified that he had been concerned about Marian and wanted to call 911. John explained that his cell phone did not work, and he did not know that he could still use it to call 911. John testified that no one prevented him from calling 911. John also testified that while he was at the Roncali residence, Marian was not tied up, and he saw no indication that she was not allowed to leave. John further stated that he did not see Roncali hit Marian, and he did not observe any bruises on her. However, John told the jury that he regretted not calling 911 that evening.

10

¶30.   Dr. Mark LeVaughn, a forensic pathologist, performed Marian's autopsy on September 17, 2020.  Dr. LeVaughn testified that Marian suffered multiple blunt injuries or bruises on her body, with internal bruising on her scalp on the right side of her head.  Marian also had pressure indentions and ligature marks that encircled her arms and legs, indicating that she had been bound.  Dr. LeVaughn observed two distinct abrasions between the ligature marks on Marian's left ankle, and he testified the abrasions looked like they were caused by a fingernail.  Dr. LeVaughn stated that these fingernail abrasions would have occurred near the time of death. He testified that none of Marian's blunt injuries caused her death.

¶31.   Dr. LeVaughn also testified that he did not observe any evidence of disease in Marian's organs.  A toxicology analysis of Marian's blood revealed the presence of several compounds: caffeine, Gabapentin, and Diphenhydramine (Benadryl) within normal ranges, as well as methamphetamine and amphetamine, a break-down product of methamphetamine. The reported level of methamphetamine in Marian's blood at the time of her autopsy was 990 nanograms per milliliter.  Dr. LeVaughn testified that in his opinion, this was a high level of methamphetamine.  Based on his autopsy and the results of Marian's toxicology report, Dr. LeVaughn concluded that Marian's cause of death was a methamphetamine overdose.

¶32.   Dr. LeVaughn testified that Marian's manner of death was homicide.  Dr. LeVaughn explained that in reaching his conclusion as to Marian's manner of death, he relied on Marian's autopsy and toxicology results, as well as information obtained throughout the investigation.  Dr. LeVaughn specified that he received information that zip ties were found at the scene where Marian died and that someone else administered methamphetamine to

11

Marian.

¶33.    Dr. LeVaughn testified that although he performed the autopsy, another pathologist, Dr. Erin Barnhart, wrote the autopsy report due to the backlog at the Medical Examiner's Office.  Dr. LeVaughn noted that in Dr. Barnhart's report, she opined that Marian's cause and manner of death were undetermined.  Dr. LeVaughn explained that he reached a different conclusion because the autopsy showed no natural disease and no lethal traumatic injury.  He also considered that the toxicology report showed a high level of methamphetamine, which caused her death.  Dr. LeVaughn testified that this evidence, coupled with the information he received from the investigation, led him to conclude that Marian's manner of death was homicide.

¶34.    Dr. Chris Long, an expert toxicologist, performed Marian's toxicology analysis.  Dr. Long testified that the postmortem toxicology analysis of the blood that was taken from Marian eight days after her death demonstrated 990 nanograms per milliliter with 83 or 87 nanograms of amphetamine.  Dr. Long testified that the amphetamine amount showed that the drug had been in her blood for a while, allowing for time to metabolize.  Dr. Long testified that generally, a single use of methamphetamine is one-tenth of a gram, and the amount of methamphetamine in Marian's blood was between three to four times that amount.  Dr. Long explained, however, that the amount of methamphetamine in Marian's blood was less than a lethal dose.  Dr. Long stated that a lethal dose of methamphetamine would cause a person to die anywhere from six to twelve hours after ingestion.

¶35.    Dr. Long opined that based on the toxicology results and the amount of

methamphetamine in her blood, Marian would have needed to consume additional methamphetamine after Friday. Dr. Long testified that Marian "could have" ingested additional methamphetamine within twelve or twenty-four hours of her death.

¶36. After the State rested its case, the defense moved for a directed verdict. After hearing arguments, the trial court denied the motion for a directed verdict.

¶37. The jury ultimately returned a verdict finding Roncali guilty of capital murder. The trial court sentenced Roncali to serve life imprisonment without eligibility for parole in the custody of the Mississippi Department of Corrections.

¶38. Roncali filed a post-trial motion to set aside the judgment of conviction and to order a new trial, which the trial court denied upon finding sufficient evidence to convict and no other errors. This appeal followed in which Roncali challenges the admission and sufficiency of the evidence, as well as the refusal to strike a member of the jury.

**ANALYSIS**

*Admission of Dr. Mark LeVaughn's Testimony*

¶39. At trial, Dr. Mark LeVaughn testified for the State as an expert in the field of forensic science. Before and during Dr. LeVaughn's testimony, Roncali objected to the trial court for allowing Dr. LeVaughn to testify that in his opinion, the manner of death was homicide. On appeal, Roncali first contends that the trial court erred by allowing this testimony.

¶40. The trial court acts "as gatekeeper on questions of admissibility of expert testimony." *See Chisholm v. State*, 365 So. 3d 229, 24 (¶43) (Miss. 2023). In discussing the trial court's role as "gatekeeper," this Court recently described the process to be used to determine the

13

admissibility of expert testimony at trial and the standard of review of an appellate court in

*Howell v. State*, No. 2023-KM-00265-COA, 2024 WL 3872637, at *4-5 (¶¶15-16) (Miss.

Ct. App. Aug. 20, 2024), *reh'g denied* (Jan. 7, 2025):

> "This Court reviews the trial court's admissibility determination for abuse of discretion." *Corrothers v. State*, 148 So. 3d 278, 295 (¶28) (Miss. 2014) (citing *Anderson v. State*, 62 So. 3d 927, 936 (Miss. 2011)). "A trial judge's determination as to whether a witness is qualified to testify as an expert is given the widest possible discretion and that decision will only be disturbed when there has been a clear abuse of discretion." *Id*. (citing *Denham v. Holmes ex rel. Holmes*, 60 So. 3d 773, 783 (¶34) (Miss. 2011)). Experts are permitted to testify if
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) **the testimony is based on sufficient facts or data**;
> >
> > (c) **the testimony is a product of reliable principles and methods**; and
> >
> > (d) **the expert has reliably applied the principles and methods to the facts of the case**.
>
> *Queen v. State*, 325 So. 3d 656, 661 (¶17) (Miss. 2021) (quoting MRE 702). **"This rule emphasizes that it is the gate-keeping responsibility of the trial court to determine whether the expert testimony is relevant and reliable."** *Denham*, 60 So. 3d at 784 (¶35) (citing MRE 702 cmt.).
>
> "This Court has adopted the United States Supreme Court's standard for judging the admissibility of expert testimony." *Ill. Cent. R.R. Co. v. Brent*, 133 So. 3d 760, 781 (¶50) (Miss. 2013) (citing *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589-96 (1993)). It is the task of the trial court to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Clark v. State*, 315 So. 3d 987, 996 (¶17) (Miss. 2021) (citing *Daubert*, 509 U.S. at 592-93). **"Expert testimony admitted at trial must be based on scientific methods and procedures, not on unsupported speculation or subjective belief."**

14

*Hubbard ex rel. Hubbard v. McDonald's Corp.*, 41 So. 3d 670, 675 (¶16) (Miss. 2010) (citing *Miss. Dep't of Mental Health v. Hall*, 936 So. 2d 917, 928 (¶31) (Miss. 2006)).

(Emphasis added).

¶41. In a hearing outside the presence of the jury on Roncali's objection to Dr. LeVaughn's testimony concerning the manner of death, Dr. LeVaughn testified that when speaking with investigators in this case, he was "informed that the methamphetamine was administered to her," and he said that he relied upon that information in forming his opinion. He further testified that when "homicide" was used to describe the manner of death in forensic cases, it meant that the "person's death results from the actions of another." At the conclusion of the hearing, the defense argued Dr. LeVaughn's opinion that the death was "caused by someone else's actions [was] a leap that needs to be based on more than what has been said so far." The trial judge ruled as follows:

> Apparently, there's no way to tell – I don't know how this methamphetamine was placed into the body of the victim. I don't know if it was taken orally, injected or some other way. There's been no testimony about that, and apparently Dr. LeVaughn wasn't able to tell because he hadn't testified to it. But it had to get inside of her somehow, and that's where the outside information comes relevant to whatever opinion that he's going to reach. So my opinion is that he's perfectly entitled to form his opinion based on everything that he knows about this case, whether it's from his own personal observation or information that he gained from other sources. So your objection is overruled.

¶42. For purposes of this opinion, the relevant portions of Dr. LeVaughn's subsequent testimony on direct examination before the jury follow:

> Q. Were you made aware of any facts in this case from investigators or coroners or otherwise that help form your opinions?

15

A. Yes.

Q. Okay. What were those?

Your Honor, an objection as to hearsay.

The Court: Overruled.

A. I don't remember exactly the timing of the information but in coming to my conclusion, the information from the coroner was relied upon, certainly the autopsy findings and toxicology result. And then there's additional information that the methamphetamine was actually administered to her by someone else, not her.

Q. Okay. Given the totality of all of this information, based on your training, experience, the autopsy exam and all this information that was provided, do you have an opinion, to a reasonable degree of medical certainty, as to the manner of death of Marian Roncali?

A. Yes, sir. I do.

Q. What is that opinion?

A. In my opinion, the manner of death of Marian Roncali is homicide. . . .

And below are portions of his testimony on cross examination:

Q. In your conclusion of – after you personally did the autopsy – you came to the result that the meth overdose was the only thing that could have caused her death; is that correct – within a reasonable degree of medical certain[t]y?

A. Well, it wasn't my conclusion after I did the autopsy because I didn't write the report. But aside from that, it is my conclusion, after reviewing information, that the cause of death is methamphetamine toxicity or overdose and manner of death is homicide.

Q. And was there any physical evidence that the autopsy unveiled that suggested to you how the meth was ingested by the victim?

A. No, sir.

Q. So you can't tell us whether or not it was taken orally, smoked, injected or snorted?

A. From the autopsy no.

Q. At the time of the autopsy, did you have the toxicologist report?

A. No. The toxicology report comes later once we obtain samples and send them off to a laboratory, and there's a turn around time – and it varies on the workload – but roughly a month or two.

Q. And so whenever you were doing the autopsy, would you ordinarily look for evidence or something like drug injection without having a toxicologist report that said that was how it was?

A. Sure. We look at the skin. That's part of the external exam. We look at the skin of the entire body, and we look for any type of abnormality.

Q. Did you do any inquiry into the victim here's past drug use, drug history?

A. I did not. No.

Q. So you've concluded homicide, which in your word, means based on the actions of another – death based on actions of another. How can you conclude that in light of the fact that – the only thing we have is she had, in your words, a lot of meth in her system. How can we say definitively that she did not ingest this on her own?

A. Well, like I said, the way that was ingested, I can't determine from the autopsy. My opinion is based on the toxicology result, the autopsy findings and results and the investigative information that someone provided this to her.

¶43. Dr. LeVaughn did not identify the officer who told him that someone injected the methamphetamine into the victim. Dr. LeVaughn did not know the basis upon which the officer reached that conclusion, or if he did know, he did not provide that information to the court. There was nothing about the post-mortem examination Dr. LeVaughn performed that

supported or confirmed a finding that the methamphetamine was injected as opposed to having been ingested. Dr. LeVaughn specifically testified that he found no injection sites on the victim's body. It is apparent that Dr. LeVaughn's opinion that the manner of Marian's death was homicide is based primarily, if not totally, upon the unsubstantiated statement by an unidentified investigator. In *Patterson v. Tibbs*, 60 So. 3d 742, 751-52 (¶35) (Miss. 2011), the supreme court stated:

> **This Court, however, has held that "the sufficiency of foundational facts or evidence on which to base an opinion is a *question of law*."** *Janssen Pharmaceutica, Inc. v. Bailey*, 878 So. 2d 31, 60 (Miss. 2004) (citations omitted) (emphasis added). As part of the trial court's gatekeeping role, it must "examine the reliability" of the expert's opinion and must determine whether the facts "afford a 'reasonably accurate basis' for the expert's conclusion." *Id.* (citations omitted).

(Emphasis added).

¶44. We find that the trial court abused its discretion by allowing Dr. LeVaughn to testify that the manner of death was homicide, in that the death resulted from the acts of a third person injecting methamphetamine into the victim. The trial court, as a part of its gatekeeping role, must consider the reliability of the foundational facts upon which an expert bases an opinion. The sufficiency of this information is a question of law. The statement by an unidentified investigator was **"unsupported speculation or subjective belief"** and was not a "**reasonably accurate basis**" to support Dr. LeVaughn's expressed expert opinion that the manner of death was homicide. *Howell*, 2024 WL 3872637, at *4-5 (¶¶15-16); *Patterson*, 60 So. 3d at 751-52 (¶35). Accordingly, we find that the trial court abused its discretion by admitting such testimony, and we must reverse Roncali's conviction.

18

¶45.    Roncali also challenges the sufficiency of the evidence to support his conviction of capital murder. He contends that there was no evidence, beyond Dr. LeVaughn's testimony, to support a finding that he administered the methamphetamine to his wife. Further, he contends that there was no evidence that he prevented Marian from leaving the residence. While he acknowledges that he temporarily restrained her for her own safety, he argues that any such "kidnapping" ended when the restraints were removed.

¶46.    In *McClung v. State*, 294 So. 3d 1216, 1232 n.16 (Miss. Ct. App. 2019), we discussed our need to review this issue under similar circumstances:

> We address McClung's sufficiency-of-the-evidence argument in the light of *Newell v. State*, 175 So. 3d 1260 (Miss. 2015), a case in which the Mississippi Supreme Court explained that a challenge to the sufficiency of the evidence should be addressed on appeal even when the appellate court determines that reversal and remand is warranted based upon an evidentiary error in the trial court because there is potential to render a judgment of acquittal. *Id*. at 1267 (¶5).

In *McClung*, we further explained,

> We may consider the erroneously admitted evidence (i.e., Keys's statement) in addressing McClung's sufficiency-of-the-evidence argument. *See Lockhart v. Nelson*, 488 U.S. 33, 40 (1988); *accord Hillard v. State*, 950 So. 2d 224, 230 (¶28) (Miss. Ct. App. 2007). Taking into account Keys's statement and the other evidence against McClung presented at trial, we find that the State presented sufficient evidence to sustain McClung's aggravated-assault convictions. We find, therefore, that the proper procedure is to reverse and remand under these circumstances. *Lockhart*, 488 U.S. at 40 (holding that the Double Jeopardy Clause allows re-trial when a reviewing court determines that a conviction must be reversed because evidence was erroneously admitted against defendant, even when, without the inadmissible evidence, there was insufficient evidence to support a conviction); *Hillard*, 950 So. 2d at 230 (¶28) ("We find that, discounting the inadmissible evidence, there was quite meager evidence to sustain [defendant's] conviction. However, all the evidence

admitted at trial was sufficient to sustain [it]. . . . Where we, on review, find the circumstances as we do, the proper result is to reverse and remand.").

*Id.* at (¶64) (footnote omitted).

¶47. Our standard of review was stated in *Perkins v. State*, 392 So. 3d 690, 695 (¶7) (Miss. Ct. App. 2024):

> We explained our analysis of sufficiency and weight of the evidence in *Jones v. State*, 380 So. 3d 974, 980-81 (¶¶13-14) (Miss. Ct. App. 2024):
>
> > We review a challenge to "the legal sufficiency of the evidence" de novo, but the evidence must be "viewed in a light most favorable to the State." *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). This means that "all credible evidence supporting a defendant's guilt should be accepted as true, and all favorable inferences drawn from the evidence must be reconciled in the prosecution's favor." *Id*. "We determine if any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Williams v. State*, 285 So. 3d 156, 159 (¶11) (Miss. 2019). **"We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements."** *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010). Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved all the elements of the offense. *Id*.

(Emphasis added). We must also disregard all evidence favorable to the defendant. *See Parish v. State*, 176 So. 3d 781, 786 (¶17) (Miss. 2015); *Moore v. State*, 996 So. 2d 756, 760-61 (¶12) (Miss. 2008); *Withers v. State*, 907 So. 2d 342, 352 (¶29) (Miss. 2005); *White v. State*, 722 So. 2d 1242, 1246 (¶21) (Miss. 1998).

¶48. Our de novo review of the evidence in this case reveals Roncali admitted that before Marian died, she confessed to him that she had been involved in several extra-marital affairs. This angered him greatly. Roncali admitted to, at a minimum, providing Marian with

20

methamphetamine. He told law enforcement that he prepared a needle for her to take methamphetamine on Friday, and said that was their preferred way to take the drug. Roncali took an injection himself, but he denied injecting Marian. He knew Marian was experiencing an adverse reaction to the injection of methamphetamine and that she had experienced a similar reaction in the past. He said he did not call 911, and there was testimony that he was concerned he would go to jail if the police were called to the residence due to illegal substances in the residence. Roncali says that he placed zip ties around Marian's hands and ankles for some period of time in an effort to keep her from hurting herself. However, he also admitted to striking her while she was restrained. The evidence from the autopsy and testimony of law enforcement showed numerous bruises to Marian's arms, legs, and face, as well as injuries to her nose, lip, cheek, and forehead. The events leading to Marian's death began on Friday and she was found dead by her son, Eli, on Sunday. According to Roncali's statement to law enforcement and Eli's testimony, Marian was acting crazy and incapacitated all weekend. A toxicologist testified for the defense that Marian had to have had additional methamphetamine after Friday based on the amount of amphetamine in her system at the time of her death on Sunday. Dr. LeVaughn gave the jury his expert opinion that Marian died as a result of an overdose of methamphetamine and that Marian's death was caused by a third person injecting her with methamphetamine.

¶49. Roncali does not challenge the jury instructions as to the elements of capital murder and kidnapping on appeal. When considering the evidence in the light most favorable to the State, as we must, we find that there was sufficient evidence for rational jurors to find beyond

21

a reasonable doubt that Marion's death was caused by Roncali during the course of her kidnapping.

## CONCLUSION

¶50.    We find that the evidence before the jury was legally sufficient to support finding Roncali guilty of capital murder. However, as discussed above, we find that the trial court erred by admitting the testimony of Dr. LeVaughn that the manner of death was homicide. Therefore, we reverse Roncali's conviction of capital murder and remand the case to the circuit court for a new trial. Because we find reversible error warranting a new trial and sufficient evidence for a conviction, we reverse Roncali's conviction and remand for a new trial and decline to address the remaining issues that Roncali raised on appeal.

¶51.    **REVERSED AND REMANDED.**

**WILSON, P.J., McCARTY AND WEDDLE,  JJ., CONCUR. CARLTON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., LAWRENCE AND ST. PÉ, JJ. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; McCARTY, J., JOINS IN PART.**

**CARLTON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶52.    I agree with Judge Emfinger's finding that there was sufficient evidence for rational jurors to find beyond a reasonable doubt that Marian's death was caused by Roncali during the course of her kidnapping.  However, I disagree that the trial court abused its discretion by allowing Dr. LeVaughn to testify that the manner of death was homicide in that Marian's death resulted from the acts of a third person injecting methamphetamine into her.  Because I would affirm Roncali's conviction and sentence, I respectfully concur in part and dissent in part.

¶53. As Judge Emfinger's opinion acknowledges, we review a trial court's decision to admit evidence, including expert testimony, for an abuse of discretion. *Inv. Res. Servs. Inc. v. Cato*, 15 So. 3d 412, 416 (¶2) (Miss. 2009). Expert testimony should be admitted only if it satisfies Mississippi Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Id*. at (¶3) (quoting MRE 702). "Expert testimony is admissible, pursuant to Rule 702, if it is relevant and reliable." *Id*. at (¶4). "The trial judge is the gatekeeper who assesses the value of the testimony." *Id*. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence," and "reversal is proper only where such discretion has been abused and a substantial right of a party has been affected." *Flaggs v. State*, 999 So. 2d 393, 401 (¶26) (Miss. Ct. App. 2008).

¶54. The trial court accepted Dr. LeVaughn as an expert witness in the field of forensic science. At trial, Dr. LeVaughn testified that his duties as a forensic pathologist include performing autopsies and determining the cause and manner of a victim's death. Dr. LeVaughn testified that to reach a conclusion as to a victim's cause and manner of death, he performs an autopsy and also relies on medical records, toxicology results, coroner reports, and information received from law enforcement. Dr. LeVaughn explained that pathologists "like to have as much [outside information] as possible in coming to our conclusions" about a victim's cause and manner of death.

¶55. Dr. LeVaughn testified that in the present case, he performed Marian's autopsy. Dr. LeVaughn opined that Marian's cause of death was methamphetamine overdose and that her manner of death was homicide. Dr. LeVaughn explained that he uses the term homicide "when someone died because of the actions of another person." Dr. LeVaughn testified that in concluding that Marian's manner of death was homicide, he relied on the information from the coroner's report, Marian's toxicology results, as well as information from law enforcement "that the methamphetamine was actually administered to her by someone else, not her."

¶56. At trial, Roncali's counsel objected to Dr. LeVaughn's testimony regarding Marian's manner of death, arguing that Dr. LeVaughn's determination was based on facts not in evidence and was outside the scope of his expertise. After hearing arguments from counsel, the trial court ultimately overruled Roncali's objection, stating, "[O]f course Dr. Levaughn is qualified to give his opinion on what the manner of death is in this case. . . . [T]hat's what . . . he does every day. He's qualified to do that."

¶57. As to Roncali's argument that Dr. LeVaughn improperly relied on what he was told by law enforcement in reaching his determination as to Marian's manner of death, the trial court explained that "[a]ny expert witness, in giving their opinion in court, is entitled to rely on their education, training and experience, any observations that they made themselves, and also information from outside sources and they put all of this together and form their opinion." The trial court found that Dr. LeVaughn considered all the information available to him, including toxicology results and reports from law enforcement, in reaching his

24

opinion as to the manner of Marian's death.

¶58. This Court has held that "it is the duty of a forensic pathologist to answer two basic questions: what was the cause of death, and what was the manner of death?" *Brown v. State*, 33 So. 3d 1134, 1138 (¶11) (Miss. Ct. App. 2009). "A forensic pathologist may testify as to what caused the victim's injuries and what trauma the injuries would produce." *Id*. "A forensic pathologist may also testify concerning the victim's wounds, suffering, and the means of infliction if the injury falls within the bounds of his expertise." *Id*. (internal quotation mark omitted). In the recent opinion *Smith v. State*, No. 2021-KA-01003-COA, 2023 WL 2884723, at *13 (¶41) (Miss. Ct. App. Apr. 11, 2023), *aff'd*, 387 So. 3d 994 (Miss. June 13, 2024), this Court held that "[t]he trial court did not abuse its discretion by allowing Dr. LeVaughn to testify as to the cause and manner of [the victim's] death[,]" explaining that "Dr. LeVaughn's testimony was within the scope of his expertise as an expert in forensic pathology."

¶59. Furthermore, Mississippi Rule of Evidence 703 "permits an expert witness to base an opinion on facts, data, or opinions presented to the expert outside of court, without regard to whether such information has been or will be admitted, or whether a court would rule it inadmissible if counsel offered it into evidence." *Darnell v. Darnell*, 167 So. 3d 195, 206 (¶30) (Miss. 2014) (citing MRE 703). "However, such information must be of a type reasonably relied upon by experts in their discipline in forming opinions or inferences upon the subject." *Id*. As Dr. LeVaughn testified, pathologists rely on outside information such as coroner reports, toxicology results, and investigation reports in reaching their opinion as

25

to a victim's cause and manner of death. *See Alexander v. State*, 759 So. 2d 411, 420 (¶31) (Miss. 2000) (stating that "reports, records, and documents prepared by others[,]" including autopsy results, "are sources that expert witnesses normally rely on" to form opinions as to cause of death); *Morrison v. State*, 332 So. 3d 396, 406 (¶55) (Miss. Ct. App. 2022) (finding that "[i]t was well within [Dr. LeVaughn's] expertise . . . to review photographs made contemporaneously at the [crime] scene").

¶60.    In support of his argument that the trial court erred in allowing Dr. LeVaughn to testify that Marian's manner of death was homicide, Roncali cites *Edmonds v. State*, 955 So. 2d 787 (Miss. 2007).  In that case, the Mississippi Supreme Court held that the trial court erroneously allowed the forensic pathologist to provide expert testimony based on opinion rather than scientific methods and procedures. *Id*. at 792 (¶8).  The supreme court also found that "[t]he error was magnified when [the forensic pathologist's] testimony was the only evidence—other than [the defendant]'s contested confession—to support the State's theory of the case[.]" *Id*. at (¶9).

¶61.    Unlike *Edmonds*, however, the testimony in the present case clearly shows that Dr. LeVaughn reached his conclusion regarding Marian's manner of death by relying on "facts, data, or opinions presented to the expert outside of court" that are "of a type reasonably relied upon by experts in their discipline in forming opinions or inferences upon the subject." *Darnell*, 167 So. 3d at 206 (¶30) (citing MRE 703).[4]  Furthermore, the jury heard additional evidence that supported the State's theory that someone else administered the

---

[4] I find that *Edmonds* is distinguishable from the present case.  Any error in allowing Dr. LeVaughn to testify as to Marian's manner of death was certainly harmless.

26

methamphetamine to Marian. Dr. Long, the toxicologist, testified that at the time of her autopsy, the amount of methamphetamine in Marian's body was approximately three times more than a standard dose of methamphetamine. Dr. Long also opined that based on the amount of methamphetamine in Marian's blood, she would have needed to consume additional methamphetamine after Friday, and the additional methamphetamine could have been ingested within twelve or twenty-four hours before her death. Eli testified at length as to Marian's condition on Saturday and Sunday morning before her death, describing her as unable to communicate or walk without assistance. Eli's testimony supported the State's theory that Marian was in no condition to inject herself with additional methamphetamine on Saturday or Sunday.

¶62. Based on the above, I find that Dr. LeVaughn, as an expert witness and a forensic pathologist, was allowed to rely upon information and reports prepared by coroners, toxicologists, and law enforcement in forming his opinion and conclusion as to Marian's cause and manner of death. *See* MRE 702 & 703; *Alexander*, 759 So. 2d at 420 (¶31).

¶63. Because I find that the trial court did not abuse its discretion in allowing Dr. LeVaughn to testify that Marian's manner of death was homicide and because I find that there is sufficient evidence to support Roncali's conviction, I respectfully concur in part and dissent in part.

**BARNES, C.J., LAWRENCE AND ST. PÉ, JJ., JOIN THIS OPINION.**

**WESTBROOKS, J., DISSENTING:**

¶64. I agree with Judge Emfinger that Dr. LeVaughn's testimony in this matter was subpar

27

and fell below the standards of Mississippi Rule of Evidence 702. However, because of that and the State's failure to present sufficient evidence that a murder occurred during or as a result of a kidnapping, which is required to prove a capital murder conviction, this case must be reversed and rendered. Accordingly, I dissent.

¶65. "When reviewing a challenge for sufficiency of the evidence, this Court must determine whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Naylor v. State*, 248 So. 3d 793, 796 (¶8) (Miss. 2018) (quoting *Ambrose v. State*, 133 So. 3d 786, 791 (¶16) (Miss. 2013)). "The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id*. (internal quotation marks omitted) (quoting *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)).

¶66. "A capital murder conviction under Miss. Code Ann. § 97-3-19(2)(e) must be supported by evidence legally sufficient to support a conviction of both the murder and the underlying felony, had either been charged alone." *Hughes v. State*, 90 So. 3d 613, 629-30 (¶48) (Miss. 2012). The elements of the crime must be proved beyond a reasonable doubt by the evidence and not mere "guesswork, speculation and conjecture." *Edwards v. State*, 469 So. 2d 68, 69 (Miss. 1985). "It is not open to reasonable debate that the right—not to be convicted of an offense unless the State proves beyond a reasonable doubt each and every element of the offense—is a fundamental right anchored in our constitution and the jurisprudence of this state." *Evans v. State*, 919 So. 2d 231, 235 (¶15) (Miss. Ct. App. 2005).

28

¶67. "[C]onviction[s] in criminal cases must rest upon finite evidence and not probabilities or surmise." *Sisk v. State*, 294 So. 2d 472, 475 (Miss. 1974). "All the proof need not be direct[,] and the jury may draw any *reasonable* inferences from all the evidence in the case." *Fontenot v. State*, 287 So. 3d 322, 326-27 (¶18) (Miss. Ct. App. 2019) (emphasis added) (quoting *Campbell v. State*, 278 So. 2d 420, 423 (Miss. 1973)). "[I]f the facts and inferences favor the defendant with such force that reasonable jurors could not find him guilty beyond a reasonable doubt," the defendant's conviction must be reversed and rendered. *Melendez v. State*, 354 So. 3d 944, 952 (¶30) (Miss. Ct. App. 2023).

¶68. The State convicted Roncali of capital murder with the underlying felony of kidnapping. However, the State did not sufficiently prove the necessary elements to find Roncali guilty of capital murder.

¶69. First, the State did not sufficiently prove that Roncali murdered Marian. Capital murder is defined as "[t]he killing of a human being without the authority of law by any means or in any manner shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . kidnapping . . . or in any attempt to commit such [felony]." Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2020). At trial, Dr. LeVaughn stated that in his expert opinion as the forensic pathologist who conducted Marian's autopsy, the bruising and marks he identified on Marian's body were not the cause of her death, and none of the markings proved to be fatal. Dr. LeVaughn testified that Marian's cause of death was an overdose of methamphetamine.

¶70. In the initial autopsy report, Marian's manner of death (which is different than the

cause of death) was listed as undetermined, yet since the autopsy was conducted, the report was changed to list the manner of death as homicide. Outside the presence of the jury, the court heard Dr. LeVaughn testify that in preparation for trial, he spoke with some of the law enforcement officers involved in the case. One of the pieces of information the investigators told him was that the methamphetamine had been administered to Marian by someone else. Dr. LeVaughn testified that ultimately, this information is why he changed the manner of death on the autopsy report from undetermined to homicide. At trial, Roncali objected to this testimony, arguing that it was based on facts not in evidence. The trial court overruled this objection and stated that Dr. LeVaughn was qualified to give his opinion on the manner of death.

¶71. In the presence of the jury, Dr. LeVaughn testified on cross-examination as follows:

Q. Now, in this case, what doctor assisted with the report?

A. Dr. Erin Barnhart is the physician that actually authored the report.

. . . .

Q. Well, what materials of yours would you have made available to Erin Barnhart – Dr. Barnhart so that she could do that report?

A. Right. To the best of my knowledge, the entire case file -- of this particular case or any case -- is duplicated and then sent to another physician or, in this case, Dr. Barnhart. So she has everything in the case file to review.

Q. Okay. And Dr. Barnhart, did she come to a different conclusion than the conclusion you presented here today?

A. She did.

Q. All right. What was her conclusion?

30

A.   As to what?

Q.   As to cause and manner of death.

A.   In her opinion, the cause and manner of death were both undetermined.

Q.   Okay. And have you -- did you at any point speak to Dr. Barnhart about her report?

A.   No.

Q.   What prompted you to revise her report?

A.   I did not revise her report. Her report stands. I am not changing her report. I just came to a different conclusion based on information that was provided to me by the district attorney's office.

. . . .

Q.   In your conclusion of -- after you personally did the autopsy -- you came to the result that the meth overdose was the only thing that could have caused her death; is that correct -- within a reasonable degree of medical certainly?

A.   Well, it wasn't my conclusion after I did the autopsy because I didn't write the report. But aside from that, it is my conclusion, after reviewing information, that the cause of death is methamphetamine toxicity or overdose and manner of death is homicide.

Q.   And was there any physical evidence that the autopsy unveiled that suggested to you how the meth was ingested by the victim?

A.   No, sir.

Q.   So you can't tell us whether or not it was taken orally, smoked, injected or snorted?

A.   From the autopsy, no.

¶72.  I do not contest that experts are permitted to use outside information in order to testify at trial.  However, "[t]he admissibility of expert testimony is evaluated in light of M.R.E.

702, which holds that such testimony may be introduced when it is found to be relevant and reliable." *Flaggs v. State*, 999 So. 2d 393, 401(¶27) (Miss. Ct. App. 2008).

¶73.    As this Court stated in *Flaggs*, "To meet the requirement of reliability, an expert's testimony must be based on the methods and procedures of science, and **not merely on subjective beliefs or unsupported speculation**." *Id.* at 401-02 (¶27) (emphasis added). "'Indefinite' expert opinions, or those 'expressed in terms of mere possibilities,' are not admissible." *Parvin v. State*, 113 So. 3d 1243, 1247 (¶14) (Miss. 2013) (quoting *West v. State*, 553 So. 2d 8, 20 (Miss. 1989)).

¶74.    In the case sub judice, no methods or procedures of science were used to support this part of Dr. LeVaughn's testimony.  I acknowledge that "a forensic pathologist's testimony concerning the victim's wounds, suffering, and the means of infliction of injury falls within the bounds of his expertise." *McGowen v. State*, 859 So. 2d 320, 335 (¶53) (Miss. 2003) (citing *Holland v. State*, 705 So. 2d 307, 341 (¶127) (Miss. 1997)).  However, Dr. LeVaughn specifically testified in this instance that Dr. Barnhart's report could not determine the cause or the manner of death, and he could not testify as to how the meth was ingested.  Anything beyond that was purely speculative.

¶75.    In *Flaggs* we also stated that

> Rule 702 expressly allows expert testimony regarding non-scientific matters, so long as the witness's knowledge, skill, experience, training, or education qualify him as an expert in a given field, and (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Flaggs*, 999 So. 2d at 402 (¶27).  Law enforcement or the district attorney's office simply

telling Dr. LeVaughn that someone administered the methamphetamine to Marian without any proof is insufficient and inadequate evidence based on facts or data. Therefore, Dr. LeVaughn's testimony that the methamphetamine was administered to Marian by someone else was speculative and not based upon sufficient facts or data; thus, it would automatically fail the test by not meeting the first requirement. Further, the testimony was not the product of reliable principles and methods, nor did Dr. LeVaughn apply reliable principles and methods to these facts of the case.

¶76. While it is true Dr. LeVaughn could testify to the manner of death, here, Dr. LeVaughn ultimately changed a key determination of this case based on a statement given to him by law enforcement and/or the district attorney's office with no actual evidence to support such statement. Under Rule 702, this part of Dr. LeVaughn's testimony about the manner of death would not be considered reliable, and the trial court erred in allowing it to be admitted.

¶77. Dr. Long (the toxicologist) mirrored the idea that the methamphetamine *may* have been administered to Marian by someone other than herself. Dr. Long testified that Marian's toxicology results from the autopsy reported "990 nanograms per milliliter" of methamphetamine in her system. Dr. Long explained that 990 nanograms is less than the lethal amount, which is around 2,000 nanograms. Certain factors, such as tolerance, can cause what is considered to be a lethal amount to vary depending on the person ingesting the methamphetamine. Dr. Long opined that Marian would have to have consumed additional methamphetamine beyond Friday because methamphetamine has what Dr. Long called

33

"half-life elimination." This term means that approximately every twelve hours, the amount of methamphetamine in someone's system reduces by half. Dr. Long stated that for Marian's levels to be at 990 nanograms at the time of her autopsy, she would have to have ingested almost 5,000 nanograms on Friday, which is over twice the lethal amount. Thus, Dr. Long testified that "[i]t is virtually impossible to get that from a Friday night dose unless she's a heavy duty addict taking massive amounts."

¶78. Even with Dr. Long's testimony on Marian's levels of methamphetamine, the jury could not reasonably infer that Roncali administered additional methamphetamine to Marian. Dr. Long testified that "intoxication depends on how much they've used methamphetamine." Dr. Long also testified, "You can take a large dose on Friday and walk around for a week or two and then die from it. It happens acutely to the time of administration." Evidence suggested that Roncali and Marian were long-time drug users. Roncali stated that it was their common practice for him to "fix the needle" for Marian, and they would take the same "hit" of methamphetamine, but Marian would administer the methamphetamine to herself. Roncali admitted that he fixed the needle for Marian on Friday but made it clear that he took the same amount and did not administer the methamphetamine to Marian on Friday or any other time throughout the weekend.

¶79. At trial, the jury was given a lesser-included offense instruction for manslaughter. The manslaughter jury instruction read as follows:

> The Court instructs the Jury that if you fail to find the Defendant guilty of the crimes of capital murder or Murder 2nd Degree, then you should continue your deliberations to consider the elements of the felony crime of manslaughter.

34

> If you find from the evidence in this case beyond a reasonable doubt that on or between September 5, 2020 and September 6, 2020, in Newton County, Mississippi, that the defendant, Carlos James Roncali, unlawfully and with culpable negligence killed Marian Chaney Roncali, a human being, then you should find the Defendant guilty of manslaughter.
>
> The Court instructs the Jury that culpable negligence is negligence of a degree so great as to be equal to a complete disregard or indifference for the safety of human life. Negligence is doing something that a reasonably careful person would not do under similar circumstances or failing to do something that a reasonably careful person would do under similar circumstances.

¶80. Even though the jury was given a lesser-included offense jury instruction for manslaughter, they still found Roncali guilty of capital murder. In a recent case before this Court, we stated that "[a] conviction of culpable-negligence manslaughter can only stand if sufficient credible evidence shows beyond a reasonable doubt that the defendant acted in such a grossly negligent manner as to show a wanton disregard or utter indifference to the safety of human life." *Fox v. State*, 378 So. 3d 1007, 1023 (¶50) (Miss. Ct. App. 2024) (citing *Brown v. State*, 304 So. 3d 692, 696 (¶17) (Miss. Ct. App. 2020)). Black's Law Dictionary defines "credible evidence" as "[e]vidence that is worthy of belief; trustworthy evidence." *Evidence*, Black's Law Dictionary 697 (12th ed. 2024).

¶81. Given the circumstances of the case at hand, I believe there is insufficient credible evidence to support a finding that Roncali took any action that demonstrated "negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of [Marian's] life." *Brown*, 304 So. 3d at 697 (¶22). When reviewing the sufficiency of the evidence, this Court does not reweigh the evidence. Rather, we look at the credible evidence to determine whether a jury could make a rational decision that the elements of the

35

crime were proven at trial beyond a reasonable doubt. "While we take the evidence in the light most favorable to the prosecution, we are not required to ignore the defense's evidence or accept incredible testimony as true." *Fox*, 378 So. 3d at 1023 (¶51) (citing *Hodges v. State*, 743 So. 2d 319, 325 (¶38) (Miss. 1999)). If a witness's testimony is necessary to support the jury's verdict and "is so implausible or so substantially impeached as to be unworthy of belief," it is not required to be credited by this Court. *Jones v. State*, 281 So. 3d 137, 147 (¶27) (Miss. Ct. App. 2019).

¶82. As stated above, no credible evidence was provided to show that Roncali acted with negligence of a degree so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of Marian's life. He admitted that in hindsight, he regretted not calling authorities to come check on Marian; however, he explained how he acted at the time in a manner he believed was reasonable. He was worried that calling authorities would lead to his returning to prison due to the drugs and pills that were inside the home. Nothing was presented in the record to show that the reason Roncali did not call 911 was due to a fear of being arrested for the condition his wife was in.

¶83. Further, Roncali could not have said with any certainty that he knew Marian's death was imminent. Roncali informed the MBI agents that he had witnessed Marian react how she did that weekend one time before while using methamphetamine, but he said that on the prior occasion, Marian was taking Neurontin. In that one prior similar occurrence, nothing deadly resulted. Roncali also admitted he took the same hit of methamphetamine as Marian that weekend, and he was not having the same reaction to it that she was. I believe this is an

36

important factor, considering that Roncali stated he had seen Marian behave like this once before while they were using methamphetamine, and Marian's toxicology report showed that she was also taking Neurontin leading up to the weekend when all the events in question occurred.

¶84.    In *O'Kelly v. State*, 267 So. 3d 282 (Miss. Ct. App. 2018), this Court reversed and rendered a depraved-heart murder conviction where a culpable-negligence-manslaughter jury instruction was also given, finding that

> the evidence at trial was insufficient to establish either depraved-heart murder or culpable-negligence manslaughter. As discussed above, O'Kelly testified that he and Rodenbaugh had taken NBOMe together previously. Rodenbaugh's roommates also testified that they knew that Rodenbaugh had taken "acid" on prior occasions. In addition, O'Kelly testified that, prior to August 9, 2014, he and Daylin had both taken hits from the same sheets at issue in this case. There is no evidence that O'Kelly, Rodenbaugh, or Daylin had experienced any adverse effects when using NBOMe previously, and O'Kelly testified that he did not know that NBOMe was dangerous. Indeed, on the night in question, O'Kelly himself took the same number of hits as Rodenbaugh.
>
> Dr. Funte testified at trial that "NBOMe is incredibly potent" and "has been linked to death at very, very low levels of the drug." She also testified that the drug is highly unpredictable so that a single dose can cause death in a short period of time. She further testified that a person cannot "develop a tolerance" to NBOMe, so a person's past experience with the drug is not a good indicator of its potential to cause harm.

*Id*. at 291 (¶¶32-33).    We reached our conclusion based on the fact that "O'Kelly and Rodenbaugh had both taken NBOMe and similar drugs on prior occasions without any adverse effects.    Moreover, O'Kelly 'himself[] ingested the same [number of hits] as [Rodenbaugh] on the same occasion, yet remained coherent.'"    *Id*. at 293 (¶39) (quoting *Lofthouse v. Commonwealth*, 13 S.W.3d 236, 241-42 (Ky. 2000)).    "O'Kelly's own use of

NBOMe shows that he did not perceive that it posed any substantial or imminent risk of death." *Id.*

¶85.  In the capital murder case sub judice, Roncali and Marian took the same hit of methamphetamine.  According to Eli, Roncali was still coherent, but Marian was not.  Furthermore, methamphetamine is not a new substance like NBOMe was at the time of our decision in *O'Kelly*.  There is more knowledge of the effects of methamphetamine, and even as Dr. Long testified, a person can develop tolerance for methamphetamine depending on how often, how long, and how much of the substance is taken.  Roncali and Marian had taken methamphetamine together on countless occasions over the course of many years without adverse effects like these.  While failing to seek medical aid in instances of an overdose *can* amount to murder or manslaughter, Roncali's own use of the methamphetamine shows he did not believe it posed any substantial or imminent risk of death.  Even though Roncali admitted he neglected to call 911 once he noticed something was wrong with Marian, he had seen her act like this one time before, and in that instance, the result was not deadly.  Thus, Roncali's case is similar to *O'Kelly* because Roncali took the same dose as Marian, as they had frequently done together, and Roncali was not having a similar reaction.  For these reasons, the State did not sufficiently prove each element of capital murder because Roncali's actions did not even amount to manslaughter, much less murder.

¶86.  The next element that the State failed to sufficiently prove for Roncali's capital murder conviction was kidnapping.  In his motion for a directed verdict, Roncali argued that the State failed to prove this was a kidnapping and that the State "left several of the essential

38

elements unproven." Judge Emfinger writes that "there was sufficient evidence for rational jurors to find beyond a reasonable doubt that Marian's death was caused by Roncali during the course of her kidnapping." However, Judge Emfinger does not cite any authority supporting the position that a conviction of kidnapping was sufficiently proved. Kidnapping occurs when "[a]ny person who, without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will . . . ." Miss. Code Ann. § 97-3-53 (Rev. 2020).

¶87.    In a case previously before this Court, the defendant claimed there was insufficient evidence to support his kidnapping conviction, and he argued the verdict was a result of "speculation, guesswork, and conjecture." *Van Wagner v. State*, 116 So. 3d 138, 142 (¶10) (Miss. Ct. App. 2012). In that case, the victim (Brasher) was found at the scene of a car incident "with unlocked chains wrapped around her legs, from her ankles to her knees." *Id*. at 141 (¶5). Van Wagner argued that the State never developed the kidnapping charge against him and that there was neither direct nor circumstantial evidence of a kidnapping. *Id*. Van Wagner argued that "[e]ven when giving all reasonable inferences to the prosecution, the evidence presented d[id] not show that on the following day Brasher was 'imprisoned against her will.'" *Id*. at (¶14). Van Wagner also argued that a reasonable juror could have found other reasons for the chains to be wrapped around Brasher's legs. *Id*. at 142-43 (¶15).

¶88.    In that instance, we found that "[t]he State did not offer any evidence to show that

Van Wagner had seized Brasher or that he had confined Brasher against her will. An eyewitness to the accident and Trooper Westbrook both testified that there were no weapons found at the scene of the accident or locks of any kind." *Id*. at 143 (¶16). "At the close of the State's case-in-chief, the State failed to establish the elements for kidnapping beyond a reasonable doubt; therefore, Van Wagner was entitled to a directed verdict. Accordingly, his kidnapping conviction and sentence [wa]s reversed and rendered." *Id*. at (¶17).

¶89. In the instant case, the elements of kidnapping have not been proved. While Roncali did admit to restraining Marian with zip ties, Roncali and Eli adamantly testified that they only restrained Marian briefly for her own safety. As soon as Eli realized the zip ties were leaving marks on Marian's skin, Roncali willfully removed the zip ties. Eli made it clear in his testimony that Marian had the free will to leave at any time had she chosen to do so. The door was unlocked, and no one was stopping her from leaving. At one point during the weekend, Roncali left the house entirely while going to the store. While Roncali was gone, Marian was at home with the free will to leave because she was not zip-tied during his absence. Eli testified that Marian did not leave the house because the condition she was in made her physically unable to leave, not because anyone was stopping her.

¶90. To conclude, there was no dispute that Marian willingly ingested methamphetamine on Friday, but the record simply does not provide how the methamphetamine was ingested. After ingesting the methamphetamine on Friday, Marian began having adverse effects that incapacitated her, but the record does not support that Roncali administered the methamphetamine to Marian, nor does it support that Marian died during or as a result of a

40

kidnapping. The record also does not support the finding of intent required by the kidnapping statute and caselaw, and the record does not support a finding that Roncali forcibly confined or imprisoned Marian against her will. Therefore, like in *Van Wagner*, the State did not satisfy the requirements to prove the underlying felony of kidnapping.

¶91. For these reasons, I believe there was insufficient evidence to convict Roncali of capital murder; therefore, this case should be reversed and rendered. Thus, I respectfully dissent.

**McDONALD, J., JOINS THIS OPINION. McCARTY, J., JOINS THIS OPINION IN PART.**